17 F.3d 1386
 146 L.R.R.M. (BNA) 2158, 127 Lab.Cas. P 11,063,
28 Fed.R.Serv.3d 1166, RICO Bus.Disp.Guide 8527
 Leslie Ray COX; R.M. Cox; Larry Driver; Barry Nichols;
John Bullard; Robert W. Kennedy, Jr.; Lorenzo G. East;
Clarence M. Pope, Jr.; C.R. Altes; Jack E. Merrymon;
Terry P. West; R.S. Arnold; M.W. Milstead; J.W. Wade;
Manning A.C. Snider; Terry H. Melvin; Thomas E. Hill;
Gary D. Swann; Ronald E. Frazier; Anthony J. Crapet;
Robert M. Green; Heath L. McMeans, III; Billy Carter; Joe
A. Knight, George Boglin, Wardell Clark, Phillip L.
Drummond, Don L. Flurry, Dennis R. Fulton, Dennis E. Jones,
W.T. Mayberry, James R. Miller, Willie J. Nation, Oscar Lee
Perry, Robert Poole, Brack Wells, Willie Young, Harry S.
Turner, Plaintiffs-Appellees, Cross-Appellants,
v.
ADMINISTRATOR UNITED STATES STEEL & CARNEGIE and United
States Steel & Carnegie Pension Fund, Defendants,
United Steelworkers of America, AFL-CIO-CLC and USX
Corporation, a/k/a United States Steel
Corporation, Defendants-Appellants,
Cross-Appellees.
Leslie Ray COX, R.M. Cox, Larry Driver, Barry Nichols, John
Bullard, Robert W. Kennedy, Jr., Lorenzo G. East, Clarence
M. Pope, C.R. Altes, Jack E. Merrymon, Terry P. West, R.S.
Arnold, M.W. Milstead, J.W. Wade, A.C. Snider, Terry H.
Melvin, Thomas E. Hill, Gary D. Swann, Ronald E. Frazier,
Anthony J. Crapet, Robert M. Green, Heath L. McMeans, III,
Billy Carter, Joe A. Knight, George Boglin, Wardell Clark,
Phillip L. Drummond, Don L. Flurry, Dennis R. Fulton, Dennis
E. Jones, W.T. Mayberry, James R. Miller, Willie J. Nation,
Oscar Lee Perry, Robert Poole, Brack Wells, Willie Young,
Harry S. Turner, Plaintiffs-Appellants,
v.
ADMINISTRATOR UNITED STATES STEEL & CARNEGIE, United States
Steel & Carnegie Pension Fund, USX Corporation,
a/k/a United States Steel Corporation,
Defendants-Appellees.
 Nos. 91-7215, 92-6218.
 United States Court of Appeals,
Eleventh Circuit.
 April 5, 1994.
 
 Carl B. Frankel, Associate Gen. Counsel, United Steelworkers of America, Pittsburgh, PA, Robert M. Weinberg, Jeremiah A. Collins, Martin S. Lederman, Bredhoff & Kaiser, Washington, DC, Jerome A. Cooper, Joe R. Whatley, Jr., Franklin G. Shuler, Jr., Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, AL, for United Steelworkers of America in No. 91-7215.
 Michael L. Lucas, Burr & Forman, William N. Clark, Redden, Mills & Clark, Birmingham, AL, Leonard L. Scheinholtz, Robert W. Hartland, Reed, Smith, Shaw & McClay, J. Michael Jarboe, USX Corp., Pittsburgh, PA, for USX Corp. in No. 91-7215.
 
 
 1
 J. Vernon Patrick, Jr., Alexander S. Lacy, William M. Acker, III, Elizabeth N. Pitman, Patrick & Lacy, P.C., Samuel Maples, Michael H. Bite, Jr., Bite, Bite and Bite, Birmingham, AL, for appellees in No. 91-7215 and appellants in No. 92-6218.
 
 
 2
 F.A. Flowers, III, Michael L. Lucas, Richard Arthur Freese, Burr & Forman, Birmingham, AL, Billy M. Tennant, S.G. Clark, USX Corp., Legal Dept., Pittsburgh, PA, Jeremiah A. Collins, Martin S. Lederman, Robert M. Weinberg, Bredhoff & Kaiser, Washington, DC, Carl B. Frankel, Associate Gen. Counsel, United Steelworkers of America, Pittsburgh, PA, Samuel H. Heldman, Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuykendall & Whatley, William N. Clark, Redden, Mills & Clark, Birmingham, AL, Robert W. Hartland, Leonard L. Scheinholtz, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for appellees in No. 92-6218.
 
 
 3
 Appeals from the United States District Court for the Northern District of Alabama.
 
 
 4
 Before ANDERSON and CARNES, Circuit Judges, and SCHLESINGER*, District Judge.
 
 CARNES, Circuit Judge:
 
 5
 This case arises out of the negotiations between the USX Corporation ("USX" or "the Company"), formerly known as United States Steel, and the United Steelworkers of America ('the Union') leading to the 1983 Collective Bargaining Agreement governing operations at the USX steel mill in Fairfield, Alabama ("the Fairfield Works"). The plaintiffs-appellees, who are or were Union members and employees at the Fairfield Works, brought this suit against USX, the administrator of the United States Steel and Carnegie Pension Fund ("the Fund"), and the Union, alleging that the Union negotiators covertly requested and received pension benefits from the Company to which they were not entitled and that, as a result, the Union negotiators agreed to concessions that damaged the plaintiffs. The district court granted summary judgment to the defendants on several of the plaintiffs' claims, and certified its decision for appeal. We review that decision, along with several of the court's rulings on discovery matters.
 
 
 6
 In part I, we discuss the facts and prior proceedings of the case as background. In part II, we review the district court's grant of summary judgment for the defendants and explain why we reverse that ruling. More specifically, we discuss the standard of review in subpart A, then we analyze the plaintiffs' RICO claim in subpart B and, in subpart C, their breach of contract claim against USX under Sec. 301 of the Labor Management Relations Act, 29 U.S.C.A. Sec. 185 (1978 & Supp.1993). In part III, we review various rulings of the district court on discovery. After explaining in part IV our lack of jurisdiction to review the district court's decision not to certify a plaintiff class as to the claim for equitable relief, we conclude in part V.
 
 I. BACKGROUND
 
 7
 The Fairfield Works steel mill in Jefferson County, Alabama, had been closed, and its approximately 2,600 employees laid off, for over a year when, in September 1983, USX and the Union sought to reach an agreement under which the mill could be reopened. William Miller, USX Vice President for Labor Relations, headed the USX negotiating team. The Union was represented by Thermon Phillips, a member of the Union's International Executive Board and Director of District 36 (which includes Alabama) and by E.B. Rich, a sub-director of District 36. Both Phillips and Rich had left USX to work for the Union years before; neither had been with the Company long enough to qualify for a pension.
 
 
 8
 The plaintiffs allege that shortly after the negotiations began, Rich took Miller aside and gave him a note demanding that the Company grant retroactive leaves of absence to a few specified Union representatives (including themselves), so that the years they had spent working for the Union would be counted for pension purposes as years spent with USX and they would therefore become eligible for USX pensions. According to the plaintiffs, the Union negotiators surreptitiously informed Miller that their agreement to any concessions at Fairfield was conditioned on their receiving Company pensions.
 
 
 9
 The final Fairfield Works Agreement ("the Agreement" or "FWA"), reached on Christmas Eve, 1983, did include sizable concessions, although the Union argues that USX acceded to numerous Union demands before the Agreement was reached, and USX argues that in return for Union concessions it committed itself to making substantial capital investments to modernize the mill. Under the Agreement, more than 500 jobs were eliminated; local working conditions rules (governing such matters as job assignments and crew sizes) were abolished altogether, giving the Company sole discretion in determining job assignments; all pending complaints, grievances, and arbitration cases were dismissed; maintenance and janitorial jobs were contracted out; and salary guarantees and certain types of incentive pay were dropped. Towards the end of the negotiations, one USX official estimated that the Agreement would yield savings of 23.5 million dollars per year. The plaintiffs assert that Rich and Phillips refused to sign the final agreement until USX covertly agreed to their pension demands. Miller testified in deposition that the Union negotiators signed the Agreement after he told them that he was under the impression that their pension request "would be considered favorably" but that he "could not assure them of that."
 
 
 10
 In 1984, after the Agreement went into effect, Rich contacted USX numerous times to inquire about the status of the pension request. In the fall of 1984, the USX Corporate Policy Committee approved a unilateral change in policy to allow approval of indefinite retroactive leaves of absence for former employees who had left to work for the Union. J. Bruce Johnston, Executive Vice President of Employee Relations, proposed the change, writing to the Committee that "it is in the Company's interest to foster and promote the goodwill of former employees who were granted leaves of absence to work for the [Union]." Shortly thereafter, the Company approved pensions for six of the Union officials that Rich had named during the negotiations (referred to by some as the "Fairfield Six"), including Rich and Phillips themselves.[1] Thus, Rich and Phillips received for themselves and for others that which they had covertly demanded during the negotiations. In November 1984, USX began paying the Fairfield Six their pensions, which were awarded retroactively to February 29 of that year. However, USX did not directly inform the potential beneficiaries, other than the Fairfield Six, of the change in its leave-of-absence policy. In March 1985, Johnston did write a letter to Union president Lynn Williams, informing him that "United States Steel's procedure was revised so that Leaves of Absence applied for by International Union Representatives may be permitted for longer periods than those established in the Labor Agreement, in designated circumstances, at the discretion of the Company on a case-by-case basis." The letter also stated that, "[p]ursuant to the above policy, we have approved requests for Leaves for six (6) International Union Representatives." The Union apparently did not inform any of its other representatives or members of the change in policy, so that the Fairfield Six were the only ones who received pensions under the new policy.
 
 
 11
 In May 1988, after several other Union representatives heard rumors of the benefits the Fairfield Six were receiving, and applied for similar pensions, the United States Steel Fund sent a letter to the Fairfield Six informing them that it would begin depositing their benefits into escrow accounts. According to the letter, recent decisions by the Second, Third, and Fifth Circuits "raised serious challenges concerning the legality of approving special, retroactive leaves of absence which enable union officials to receive credit for pension purposes for extended periods they spend in the service of the Union." The letter explained that "in light of current legal developments," continued payment of the benefits could subject the Fairfield Six, USX, and the Fund "to criminal liability."
 
 
 12
 In 1990, as a result of their actions concerning the negotiations and pensions, USX, Rich, and Phillips were convicted of violating 29 U.S.C.A. Sec. 186 (1978 & Supp.1993). Subsection (a) of that statute prohibits "any employer" from paying, lending, or delivering "any money or thing of value" to "any representative of any of his employees who are employed in an industry affecting commerce." 29 U.S.C.A. Sec. 186(a)(1) (1978 & Supp.1993). Subsection (b) makes it "unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section." 29 U.S.C.A. Sec. 186(b)(1) (1978 & Supp.1993). The appeal of those convictions is pending before this Court.
 
 
 13
 Thirty-eight present and former USX employees brought this suit in the Northern District of Alabama, seeking monetary damages and equitable and declaratory relief for a class of similarly situated workers. The final amended complaint asserted five claims against USX, the Fund, and the Union. Count One alleged that the defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. Secs. 1961 et seq. Count Two alleged that the Union breached its duty of fair representation, and that the Company breached its contractual duties, in violation of the Labor Management Relations Act (LMRA) Sec. 301, 29 U.S.C.A. Sec. 185(a). Count Three alleged that USX and the Union committed an unfair labor practice in violation of the National Labor Relations Act (NLRA), 29 U.S.C.A. Secs. 151 et seq., by failing to negotiate in good faith. Count Four alleged that the defendants violated their fiduciary duties under the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. Secs. 1001 et seq., by failing to notify the plaintiffs or the Department of Labor of the change in the Company's leave policy. Finally, Count Five alleged violations of 29 U.S.C.A. Sec. 186, and sought an order enjoining the defendants from future violations.
 
 
 14
 The district court certified a plaintiff class, with respect to the damages claims only, of all those who were employed by USX in Jefferson County, Alabama, and represented by District 36 of the Union at any time between July 1, 1983, and August 14, 1990. The court, citing "the substantial conflicts within the class" over the plaintiffs' request that the Agreement be rescinded, declined to certify a plaintiff class with respect to the plaintiffs' claims to equitable relief. During the course of discovery, the plaintiffs deposed Lynn Williams, president of the International Union, and asked him about the letter he had received from J. Bruce Johnston in March of 1985, informing him of USX's change in the leave-of-absence policy. Williams testified that he made no inquiry upon receiving the letter, but "had some conversation about it" with the Union's attorneys. Plaintiffs' counsel then asked Williams "What did you say and what did they say on that occasion about the March 5, 1985 letter?" The Union's counsel instructed Williams not to answer on the ground that the information sought was protected by the attorney-client privilege. After the plaintiffs moved for an order compelling Williams to respond to the question, the district court determined that the answer was discoverable and, on January 10, 1991, ordered that Williams answer. The court then certified the Union's appeal from that order, and we granted the Union's petition for permission to appeal.
 
 
 15
 Also during the course of discovery, USX objected to some of the plaintiffs' deposition questions, document requests, and interrogatories, on the ground that the information sought was protected by the attorney-client privilege. When the plaintiffs filed a motion to compel USX to respond, the district court determined that USX, by asserting the defense that it had intended to act in compliance with the law, waived the privilege with respect to those communications bearing on the question of USX's intent in awarding pension credits to Union officials. Accordingly, the court granted the plaintiffs' motions to compel USX to produce materials bearing on USX's knowledge of the legality of its actions. The district court certified USX's appeal from that order, and we granted USX leave to appeal, consolidating the two discovery appeals into one and giving it number 91-7215.
 
 
 16
 The district court granted the defendants' motion for summary judgment on the plaintiffs' claims under RICO and claims under LMRA Sec. 301 against both USX and the Union, on the ground that the plaintiffs had failed to show that the discussions about pension credits had caused them any injury. The district court dismissed the unfair labor practice claim on the ground that the National Labor Relations Board has exclusive jurisdiction over such claims. The district court also granted the Union's motion for summary judgment on the plaintiff's ERISA claim against the Union. The district court entered final judgment on those claims as to which summary judgment was granted, with the exception of the claim against the Union for violation of the duty of fair representation under LMRA Sec. 301, which is therefore not before this Court. In appealing that final judgment, the plaintiffs have abandoned the ERISA claim against the Union and NLRA claims. They appeal only the award of summary judgment on the RICO claim and the Sec. 301 claim against USX for breach of contract; they also appeal a number of discovery orders the district court entered prior to summary judgment. That appeal bears number 92-6218, and has been consolidated with the discovery appeal, number 91-7215.
 
 
 17
 II. THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT
 
 A. THE STANDARD OF REVIEW
 
 18
 We review a "grant[ ] of summary judgment de novo, applying the same legal standard applied by the district court in the first instance." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1117 (11th Cir.1993). Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255, 106 S.Ct. at 2513 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970)). In other words, "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir.1989).
 
 
 19
 The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2553. With regard to issues on which the non-moving party bears the burden of proof, the moving party need not support its motion with evidence "negating the opponent's claim." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir.1993) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir.1991) (en banc )). Once the moving party has carried its burden, the non-moving party must show the existence of a genuine issue of material fact to avoid summary judgment. Id.
 
 B. THE RICO CLAIM
 
 20
 The civil provision of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. Sec. 1964(c) (1984 & Supp.1993), provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Thus, to recover on a civil RICO claim, the plaintiffs must prove, first, that Sec. 1962 was violated; second, that they were injured in their business or property; and third, that the Sec. 1962 violation caused the injury. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). Those who violate Sec. 1962 are
 
 
 21
 those who engage in, or aid and abet another to engage in, a pattern of racketeering activity if they also do the following: invest income derived from the pattern of racketeering activity in the operation of an enterprise engaged in interstate commerce (section 1962(a)); acquire or maintain, through the pattern of racketeering activity, any interest in or control over such an enterprise (section 1962(b)); or conduct, or participate in the conduct of, the affairs of such an enterprise through a pattern of racketeering activity (section 1962(c)). Section 1962(d) makes it a crime to conspire to violate sections 1962(a), (b), or (c).
 
 
 22
 Pelletier v. Zweifel, 921 F.2d 1465, 1495-96 (11th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991). "Racketeering activity" includes violations of 29 U.S.C.A. Sec. 186, which restricts the payments for which a union representative can ask and which his employer can give. 18 U.S.C.A. Sec. 1961(1)(C) (1984 & Supp.1993); 29 U.S.C.A. Sec. 186 (1978 & Supp.1993).
 
 1. Violation of Sec. 1962
 
 23
 USX argues that the plaintiffs failed to create a genuine issue of material fact about the existence of a violation of Sec. 1962, which is the first element of a civil RICO claim, and the Union has adopted USX's arguments. First, USX argues that the plaintiffs did not proffer sufficient evidence of the existence of a "pattern of racketeering activity." Even as to the allegations, according to the Company, the "[p]laintiffs allege nothing more than a single, uncomplicated episode of alleged wrongdoing in the nature of an alleged 'garden-variety' act of extortion or bribery," and a single act cannot constitute a "pattern." Second, and in the alternative, USX argues that even if the plaintiffs have met their burden of pleading and have proffered sufficient evidence concerning the existence of a pattern of racketeering activity, they have failed to meet their burden with respect to the other elements required under Sec. 1962(a), (b), or (c). We address these two contentions in turn.
 
 
 24
 a. The Pattern of Racketeering Activity
 
 
 25
 A "pattern of racketeering activity," for purposes of the RICO Act, "requires at least two acts of racketeering activity," 18 U.S.C.A. Sec. 1961(5) (1984 & Supp.1993), and the Supreme Court has observed that "two isolated acts of racketeering activity do not constitute a pattern." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Instead, " '[i]t is the factor of continuity plus relationship which combines to produce a pattern.' " Id. (quoting S.Rep. No. 91-617, 91st Cong., 1st Sess. 158 (1969) (emphasis added)). More recently, the Court has expanded on the definition of "continuity" and "relationship." Borrowing from Title X of the Organized Crime Control Act of 1970, the Court has explained that predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989) (quoting 18 U.S.C. Sec. 3575(e)). As for 'continuity,' the Court explained:
 
 
 26
 "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. See Barticheck v. Fidelity Union Bank/First National State, 832 F.2d 36, 39 (CA3 1987). It is, in either case, centrally a temporal concept--and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement....
 
 
 27
 Id. at 241-42, 109 S.Ct. at 2902.
 
 
 28
 We have held that "[a]cts that are part of the same scheme or transaction can qualify as distinct predicate acts," Bank of America v. Touche Ross & Co., 782 F.2d 966, 971 (11th Cir.1986), as long as "each act constitutes a separate violation of the state or federal statute governing the conduct in question," United States v. Watchmaker, 761 F.2d 1459, 1475 (11th Cir.1985) (internal quotations omitted), cert. denied, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986). " 'If distinct statutory violations are found, the predicate acts will be considered to be distinct irrespective of the circumstances under which they arose.' " United States v. Gonzalez, 921 F.2d 1530, 1545 (11th Cir.1991) (quoting Bank of America, 782 F.2d at 971).
 
 
 29
 As the district court properly recognized, that which USX argues is a single episode of bribery could be viewed by a jury as a scheme consisting of multiple violations, sufficiently interrelated and continuous to constitute a pattern of racketeering activity. Each monthly payment of pension benefits to the Fairfield Six could be interpreted as a "thing of value" for purposes of 29 U.S.C.A. Sec. 186, and therefore as a separate predicate act for purposes of RICO. See, e.g., United States v. Boffa, 688 F.2d 919, 935-36 (3d Cir.1982) (holding that a reasonable jury could find that each monthly lease payment made to secure use of an automobile for a union official for four months constituted a separate predicate act under RICO), cert. denied, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983). The jury could easily determine from the proffered evidence that the payments are connected by a common scheme, plan, or motive, and therefore satisfy the relatedness requirement.
 
 
 30
 USX made payments to the Fairfield Six over a period of three and one-half years (from December 1984 to May 1988). This case is therefore unlike Aldridge v. Lily-Tulip, Inc., 953 F.2d 587 (11th Cir.1992), in which we held that a fraud requiring the use of the mails for six months "was accomplished in too short a period of time ... to qualify as a pattern of racketeering activity." Id. at 593. Furthermore, as the district court observed, a reasonable jury could find that the defendants carried on racketeering activity during the 1983 negotiations, when the Union negotiators made the illegal request, and throughout 1984, when the pensions were established. That period of time is sufficiently long for a reasonable jury to conclude that the plaintiffs established closed-ended continuity.
 
 
 31
 b. The Other Requirements of Sec. 1962
 
 
 32
 USX argues in the alternative that even if the jury could find that the defendants engaged in a pattern of racketeering activity, the award of summary judgment against the plaintiffs should be upheld because there is no genuine issue of material fact that the additional elements required for criminal liability under the various subsections of Sec. 1962 exist. We disagree.
 
 
 33
 Under Sec. 1962(c) it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." USX argues that a jury could not find a violation of that subsection because USX cannot be both the "person" and the "enterprise" contemplated by Sec. 1962(c). In United States v. Hartley, 678 F.2d 961, 986 (11th Cir.1982), a panel of this Court held "that a corporation can simultaneously be named as a defendant and satisfy the 'enterprise' requirement." (Emphasis added). USX argues that we should reverse that position. That, of course, we cannot do, because "[t]his panel is bound by the decisions of prior panels of the Eleventh Circuit unless overruled by the en banc court or the Supreme Court." Pollgreen v. Morris, 911 F.2d 527, 534 (11th Cir.1990). Under Hartley, a reasonable jury could conclude that the defendants violated Sec. 1962(c); we therefore need not reach the plaintiffs' counter-arguments that the jury could find violations of Sec. 1962(a), (b), or (d), or that the jury could find a violation of Sec. 1962(c), even if Hartley is rejected, because the jury could find that the Fairfield Works, or the Union, or District 36 of the Union, or the Fund, was the "enterprise" for RICO purposes.
 
 
 34
 USX also argues that RICO is unconstitutionally vague. In United States v. Van Dorn, 925 F.2d 1331, 1334 n. 2 (11th Cir.1991), this Court found the argument that RICO is unconstitutionally vague to be "completely lacking in merit."
 
 
 35
 In summary, the plaintiffs have established the first element of a civil RICO claim by producing evidence from which a reasonable jury could conclude that the defendants violated Sec. 1962(c). Thus, the district court correctly declined to grant summary judgment on the first RICO element. We turn now to causation, the second element of a RICO claim, the ground on which the district court did grant summary judgment for the defendants.
 
 2. Causation
 
 36
 In awarding summary judgment to the defendants on the RICO claim, the district court held that the plaintiffs had failed to show the existence of a genuine issue of material fact as to whether the alleged bribery of the Union negotiators caused injury to the plaintiffs. The court reasoned that the plaintiffs had produced no evidence that the alleged bribes caused any of the concessions in the 1983 Fairfield Works Agreement [FWA], and therefore they could not recover:
 
 
 37
 Considering [the] evidence in the light most favorable to the plaintiffs, the jury could find the pension issue was the subject of secret discussions several times during the FWA negotiations and that Rich considered the pensions a condition of settlement, but USX did not promise to favorably consider the pension request until after the FWA was completed and typed and when Rich and Phillips refused to sign. There is also some evidence from which the jury could infer that USX "committed" to providing the pensions, and that USX intended to influence Rich and Phillips in some manner.
 
 
 38
 There is no indication or evidence that the negotiators on either side were swayed by their outstanding request for pensions while they negotiated the terms of the agreement. In light of the undisputed evidence that the FWA never changed after USX promised to consider the pension issue, the jury could not reasonably infer that USX's promise influenced the negotiators to make concessions in the FWA.
 
 
 39
 More importantly, in view of the additional undisputed evidence that the concessions resulted from the need to make the Fairfield Works profitable before it was reopened, the jury could not soundly infer that it was more likely that the concessions resulted from the bribery of Union officials than from economic necessity. From the evidence plaintiffs presented, a jury could only speculate about USX's motives in giving pensions to Union officials. There is no evidence from which the jury could conclude USX obtained the FWA concessions as a result of paying Union officials pensions. Plaintiffs' invitation to assume that the concessions must have been the result of bribery is not sufficient where the concessions could just as likely have resulted from the need to make Fairfield economically viable.
 
 
 40
 The district court's assertion, that there was substantial evidence that the concessions were caused by adverse economic conditions in the steel industry at the time, apparently refers to the deposition testimony of the negotiators: that the pension question had not influenced the Agreement; that the USX negotiators had said USX could not afford to reopen the plant without concessions; and that the Union negotiators did win a less concessionary agreement than the Company had initially been willing to accept.
 
 
 41
 We begin our analysis by observing that the plaintiffs need not prove that the matter involving the personal pension benefits caused all of the concessions in the Agreement, or that the prevailing economic conditions had no effect on the negotiations. It is well-established that RICO plaintiffs must prove proximate causation in order to recover. Holmes v. Securities Investor Protection Corp., --- U.S. ----, ---- - ----, 112 S.Ct. 1311, 1317-18, 117 L.Ed.2d 532 (1992); see also Reverend Father O'Malley v. Reverend Father O'Neill, 887 F.2d 1557, 1561 (11th Cir.1989). In other words, "[c]ausation principles generally applicable to tort liability must be considered applicable" in RICO cases. Brandenburg v. Seidel, 859 F.2d 1179, 1189 (4th Cir.1988). A proximate cause is not, however, the same thing as a sole cause. Instead, a factor is a proximate cause if it is "a substantial factor in the sequence of responsible causation." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir.1990). It is beside the point whether the depressed condition of the steel industry also contributed to the concessions. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts Sec. 41, at 268 (5th ed. 1984) ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present.")
 
 
 42
 Moreover, there were many different concessions worth varying amounts in the Agreement. The proximate cause question is whether Rich and Phillips' pursuit of the pensions was responsible for changing the amount of any concessions to which the Union agreed, not whether it was responsible for the Union's having to make any concessions in the first place or most of the concessions in the final analysis. For example, if the Agreement cost the Union membership X million dollars in total concessions, but would have cost only X million minus 100,000 dollars in concessions but for the personal pension matter, then that matter caused the membership 100,000 dollars in injury. The district court appears to have recognized as much, noting that "[p]laintiffs' return to work under less favorable conditions constituted an injury to their business or property sufficient to satisfy RICO requirements, if plaintiffs could show they would have returned to work under a less concessionary agreement absent the RICO violations." We agree with that proposition.
 
 
 43
 To avoid summary judgment, therefore, the plaintiffs must point to evidence from which a reasonable jury could infer that Rich and Phillips' pursuit of pensions for themselves and their friends caused some part of the total dollar amount of concessions in the Fairfield Works Agreement. The district court concluded that "the jury could not reasonably infer that USX's promise influenced the negotiators to make concessions in the FWA," because any deal on the pensions came after the Agreement was in final form (although before it was signed). The court seems to have assumed that the plaintiffs must prove that USX's ultimate agreement to provide the pension benefits caused the concessions. However, the mere request for unearned pension benefits constituted a violation of 29 U.S.C.A. Sec. 186(b) and therefore was racketeering activity under 18 U.S.C. Sec. 1961(1)(C). That request, it will be recalled, was first made early in the course of the negotiations. Accordingly, the element of causation is satisfied if the Union negotiators were influenced to make any amount or degree of concessions in the subsequent rounds of negotiations by their desire to convince the Company to agree to their outstanding illegal request coupled with the Company's failure to reject the pension request from the beginning.
 
 
 44
 Under the federal standard for the sufficiency of evidence, a plaintiff may prove causation by circumstantial evidence. Porter v. American Optical Corp., 641 F.2d 1128, 1142 (5th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). "Inferences from circumstantial facts may frequently amount to 'full proof' of a given theory, and may on occasion even be strong enough to overcome the effect of direct testimony to the contrary." Rutherford v. American Bank of Commerce, 565 F.2d 1162, 1164 (10th Cir.1977). Here, although there may be no direct evidence that the Union negotiators made concessions to obtain personal pension benefits, there is a great deal of circumstantial evidence that could lead a reasonable jury to that conclusion. We are particularly reluctant to disregard inferences drawn from circumstantial evidence as to the negotiators' motive. This Circuit is "mindful that 'summary procedures should be used sparingly ... where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.' " Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1502 (11th Cir.1985) (quoting Norfolk Monument Co. v. Woodlawn Memorial Gardens, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969)), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).
 
 
 45
 In the following paragraphs, we discuss the facts which a reasonable jury could rationally find from the evidence at the time summary judgment was granted, and the evidence from which these facts could be found. Then, we will discuss the cumulative effect of these facts and the conclusion that rationally could be inferred from them. As we said in Swint v. City of Wadley, 5 F.3d 1435, 1439 (11th Cir.1993), "what we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion[ ] may not be the actual facts. They are, however, the facts for present purposes, and we set them out below."
 
 
 46
 Gaining the personal pension benefits was of paramount concern to Rich and Phillips in the Fairfield negotiations, and it was a condition of their agreement to any settlement. Emmett Bruce Thrasher, director of another International Union district, testified at the criminal trial that Rich had told him that achieving the pension benefits would be a prerequisite of the Union negotiators' consent to any agreement in the Fairfield negotiations. USX's Vice President for Labor Relations, William Miller, took notes at an October 27, 1983, meeting during the negotiations which also refer to Rich's demand for pension benefits as "a condition of settlement" of any agreement at Fairfield.
 
 
 47
 Rich and Phillips brought their personal pension demand up more than once, and it was discussed intermittently throughout the negotiation process. Miller testified that Rich first raised the matter after one of the early negotiating sessions by saying "I want this taken care of" while handing Miller a piece of paper on which the demand for pension credit for Fairfield Union officials was written. On December 22, 1983, two days before the end of the negotiations, Miller met in Pittsburgh with other high-ranking USX officials and listed the pension credits for the Union officials as one of the items still on the table. Miller testified that he reported that, "Mr. Rich and Mr. Phillips had continued to talk about the matter in the context of ... other corporations and what they were doing." Furthermore, when Miller asked J. Bruce Johnston, USX Executive Vice President for Employee Relations, for instructions on how to respond to Rich and Phillips' ultimatum on the pension question, Johnston responded with a very detailed set of conditions under which USX would agree to the pension request. (Johnston testified that he told Miller not to guarantee anything, but the notes Miller took during the conversation contain no such instruction.) It is permissible to infer that Johnston would not have produced such a detailed list of conditions for the pension benefits if the subject of the pension benefits had been mentioned only once months earlier and then dropped; therefore, the benefits had been discussed several times over the course of the negotiations while the concessions were being hammered out.
 
 
 48
 The subject of personal pensions for Rich and Phillips was always discussed between them and the USX negotiators in secret. Rich first raised the issue by slipping Miller a handwritten note after a negotiating session. Phillips testified that thereafter, when the USX negotiators discussed the subject, they never did so in the hotel conference room where the formal negotiations were held, but only in a small room across the hall or in the hallway or lobby.
 
 
 49
 After the concessions were negotiated, Rich and Phillips refused to sign the Agreement until they received assurances that their pension requests would be considered favorably. Miller testified in deposition that Rich and Phillips refused to sign the Fairfield Agreement until they had received an answer to their request for pension credit, and that as far as USX was concerned, "their signatures were essential." Only after he told them that he thought their pension request "would be considered favorably" did they sign, Miller testified.
 
 
 50
 The words and actions of USX officials indicate that the Company itself believed that it had made a commitment to provide the pension benefits as part of the Fairfield Works Agreement. Johnston's signature appears on the recommendation for pensions for the Fairfield Six, which states that the "pensions ... are recommended in accord with the December 24, 1983 agreement between the Company and the USW at Fairfield Works." (Emphasis added). According to the original proposal, the pensions were to start on September 1, 1984. A September 25, 1984, letter to Johnston from J.D. Short, USX's Vice President for Employee Benefits, refers to a change in the starting date to February 29, 1984, "as I understand the commitment was made that" the pensions would be effective as of March 1. The pension requests submitted by each of the Fairfield Six bear the notation "Per 12-24-83 Agreement." Furthermore, when other Union officials applied for similar pensions, Johnston wrote Union president Lynn Williams that the policy was being cancelled--but that the Fairfield Six would continue to receive their payments. That action and the documents quoted above indicate that USX's supposedly unilateral change in policy was actually the result of a commitment to provide pensions to the Fairfield Six, a commitment given in exchange for concessions from Rich and Phillips.
 
 
 51
 The defendants tried to keep the existence of the Fairfield Six's pensions secret. In 1986, two years after he had begun receiving his pension, Rich told two other Union representatives that the pension matter had not been resolved in the Fairfield negotiations, so that they need not apply for pensions. There is evidence that Phillips emphatically denied that pension credits were even discussed at the Fairfield negotiations. Although Union president Williams received a letter from USX in 1985 stating that USX had changed its leave-of-absence policy to allow Union representatives longer leaves of absence "at the discretion of the Company on a case-by-case basis," the Union never approached the Company about granting more such leaves of absence and seems not to have informed any of its representatives of the opportunity. Furthermore, in its answer to a lawsuit filed by Emmett Bruce Thrasher, also a Union representative, the Union denied the allegation that Rich, Phillips, and others had received pensions as part of the Agreement. In another lawsuit brought by William Sommerville, also a Union representative, Union attorney Bernard Kleiman swore in an affidavit that Rich, Phillips, and two others of the Fairfield Six had not retired from USX as of January 30, 1986, although USX records clearly indicate that, for pension purposes, they had retired.
 
 
 52
 USX, like the Union, told no other Union representative about the change in its pension policy, although a number of other Union representatives would appear to have qualified for it. During the negotiations, Miller asked Schick, USX's General Manager of Labor Relations, to prepare information on the Fairfield Six and to keep the matter confidential. Ed Owens, a USX official at the Fairfield plant, was asked to prepare pension documents for the Fairfield Six and not to "publicize" it; according to USX, those documents have now disappeared.
 
 
 53
 A jury could find it strange that those who insist that their conduct was proper and their intent pure went to such great lengths to hide it all from the light of day. From such secrecy much may be inferred.
 
 
 54
 Giving the Fairfield Six the pensions Rich and Phillips demanded during contract negotiations cost the Company a substantial sum of money, and the Company would not have agreed to that private concession without a concession from the Union side in return. Johnston, testifying about a request that International Union president Lynn Williams made during the same period that USX extend pension benefits for workers at another plant, said that he told Jim Short: "I'm sure not going to voluntarily give away millions of dollars that we might not have to give away in a year in which we are losing money at an awesome rate." He also recalled that "all during '83 and '84 we had a very correct and very tough and very hardnosed arm's length relationship with the Steelworkers." It strains credulity to suggest that a company committed to the profit motive, in a period in which it was in dire financial straits, would in a "very hardnosed arm's length relationship" give away, for nothing in return, unearned pension benefits that cost USX hundreds of thousands of dollars.[2]
 
 
 55
 Instead of receiving personal pension benefits for themselves and their friends, Rich and Phillips could have demanded and obtained from USX a reduction in the Union's concessions of an amount equal to the cost of the pensions. That conclusion follows as a matter of economics from the nature of the collective bargaining process. There is no reason why a company that would agree to give up a dollar in unlawful pension benefits to union officials would not instead agree to accept one dollar less in concessions from the Union. Indeed, assuming that freedom from the risk of detection and prosecution is worth something to corporations and their officials, it is reasonable to infer that the Company would have been willing to forego more than one dollar in concessions for every dollar it could have avoided paying out in illegal benefits.
 
 
 56
 In summary, negotiating their personal pensions was of paramount concern to Rich and Phillips, and they considered it to be a condition of settlement. The issue was discussed intermittently throughout the negotiations about concessions, and always in secret. Rich and Phillips refused to sign the negotiated agreement until they received assurances that their pension requests would be considered favorably. The Company and its officials believed that it was committed to pay the pension benefits as part of the Fairfield Works Agreement. All of the defendants tried very hard to keep the pensions secret. The pensions cost the Company a substantial sum of money, and it would not have agreed to them without receiving something in return. Finally, instead of using their position as Union negotiators to gain the pensions for themselves and their friends, Rich and Phillips could have secured a reduction in concessions equal to or greater in value than the pensions. From all of those facts, a reasonable jury could conclude that the pursuit of personal pension benefits by Rich and Phillips, coupled with the Company's failure to reject the idea from the beginning, caused the Agreement to contain more concessions from the Union than it would have contained if Rich and Phillips had been completely loyal to the rank and file Union membership.
 
 
 57
 The district court observed that "USX did not promise to favorably consider the pension request until after the FWA was completed and typed and when Rich and Phillips refused to sign." Because the Agreement's text did not change after USX promised that the request "would be considered favorably," the court concluded that the plaintiffs could not show that the Union negotiators made any concessions to secure their pensions. The district court erred by placing too much reliance upon the timing of the Company's formal promise of the illegitimate pensions. As we have explained above, there was ample evidence that, even without a formal agreement, the combination of illicit behavior by Rich, Phillips, and the Company caused the amount of the concessions actually negotiated to be more than they would otherwise have been.
 
 
 58
 Moreover, the district court placed too little weight on the value of the signatures of Rich and Phillips to the negotiated Collective Bargaining Agreement. Even though the agreement had already been negotiated and the concessions agreed upon, Rich and Phillips had something that the Company needed and was willing to trade for--their signatures as the Union's negotiators. USX was willing to trade a promise to grant the pension benefits (saying the requests "would be considered favorably") in exchange for those signatures, and that trade was made. Instead of trading their signatures for personal pension benefits, which the Union concedes "may well" have been worth hundreds of thousands of dollars, Rich and Phillips could have traded their signatures for the benefit of all of the workers whom they represented--refusing to sign until the Company agreed to reduce the amount of concessions granted by the same hundreds of thousands of dollars. Thus, even focusing exclusively upon the conclusion of the collective bargaining process, a rational jury could infer that, as a result of their demand for personal pension benefits, the Agreement was more concessionary than it would have been otherwise. The district court should not have granted summary judgment for the defendants on the causation issue.[3]
 
 3. Union Liability Under RICO
 
 59
 The Union argues in the alternative that the district court's grant of summary judgment for the Union should be affirmed because the Union is not liable under RICO for the acts of its representatives. The Union argues that because it is the victim of the racketeering activity of its negotiators, it should not be held liable for their violations.
 
 
 60
 The plaintiffs argue that the Union can be liable under RICO, not only under the principle of respondeat superior, but also because "the Union not only learned of its employees' illegal acts and failed to take action, but also willfully participated, conspired, aided and abetted, ratified and actively concealed the illegal acts of Rich and Phillips," while under a fiduciary duty to act in the best interest of its members. They contend that the Union is not a victim; the victims, they maintain, are the "rank-and-file" workers.
 
 
 61
 We will address in turn the theories that the parties have put forward.
 
 
 62
 a. Liability of "Victim" Enterprise Under RICO
 
 
 63
 According to the Union, "Congress did not intend RICO liability to attach to legitimate enterprises that are used as passive instruments for the racketeering activities of employees or others," but instead intended to protect those enterprises. The Union argues that, in response to Congress' intention, "the cases ... hold that where an individual violates RICO by using an enterprise as the instrumentality of his racketeering activities, liability attaches to the wrongdoing individual, not to the enterprise."
 
 
 64
 The district court determined that there was no support in the record for the Union's claim that it was a victim. The only injury alleged was the injury to the Union member plaintiffs; the Union produced no evidence that the Union itself had been victimized. The court therefore held that the Union had failed to demonstrate the absence of a genuine issue of material fact, and refused to grant summary judgment on the basis that the Union was a victim of racketeering activity and therefore could not be held liable for that activity.
 
 
 65
 However, we need not address the question of whether the Union presented adequate evidence of its victimization, because we reject the Union's argument that "[t]he law in this Circuit is fully consistent with" the cases refusing to hold RICO enterprises liable for the violations of their subordinates. Our review of the cases cited by the Union reveals that although some courts have recognized a narrow exception to vicarious liability under RICO, that exception has been created in order to preserve the non-identity rule (that under Sec. 1962(c), the RICO defendant and the RICO enterprise cannot be one and the same). As discussed in subpart B.1.b, above, this Circuit has unequivocally rejected that rule.
 
 
 66
 The cases that the Union cites for the proposition that an enterprise is not liable under RICO for the acts of its employees which abuse the enterprise all trace their roots to Haroco, Inc. v. American Nat'l Bank & Trust Co., 747 F.2d 384 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). In Haroco, the Seventh Circuit held that the American National Bank could not be liable under 18 U.S.C. Sec. 1962(c), because that subsection "requires separate entities as the liable person and the enterprise which has its affairs conducted through a pattern of racketeering activity." Id. at 400. The Haroco court reasoned that the "non-identity" requirement of Sec. 1962(c) would not allow corrupt corporations to escape all RICO liability, because Sec. 1962(a) contains no such requirement; under that subsection, "the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations." Id. at 402. As a result, the "corporation-enterprise" is "liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering." Id.
 
 
 67
 In Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1306 (7th Cir.1987), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989), "to avoid holding vicariously liable a corporation that was the victim of a RICO violation," the Seventh Circuit held that a corporation will be held vicariously liable for the RICO violations of its employees "only when 1) the corporation has derived some benefit from the RICO violation and 2) imposing vicarious liability is not inconsistent with the intent of Congress." Id. (emphasis omitted). Following the reasoning laid out in Haroco, the court held that "[v]icarious liability ... has only limited application to civil RICO." Id. The Seventh Circuit has voiced concern "that respondeat superior might be used to circumvent Sec. 1962(c)'s requirement that the person conducting the racketeering activities be separate from the enterprise through which those activities are conducted." Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1281 (7th Cir.1989). Nonetheless, the Seventh Circuit has approved vicarious liability when holding the employer liable would not violate the non-identity rule: "Respondeat superior is ... entirely appropriate under both subsections (a) and (b)" of Sec. 1962, because those subsections contain no non-identity requirement. Liquid Air Corp., 834 F.2d at 1307. Similarly, respondeat superior will make liable under Sec. 1962(c) a corporation whose officers conspire to conduct the affairs of another corporation through a pattern of racketeering, because the second corporation then serves as the RICO "enterprise." Ashland Oil, 875 F.2d at 1281.
 
 
 68
 Despite the inclusion of some broad language, the cases cited by the Union stand only for the proposition that, in order to preserve the non-identity rule, vicarious liability should not be imposed under Sec. 1962(c) where the employer is also the RICO enterprise. Thus, although the First Circuit in Schofield v. First Commodity Corp., 793 F.2d 28 (1st Cir.1986), stated broadly that "the concept of vicarious liability is directly at odds with the Congressional intent behind section 1962(c)," id. at 32, the actual holding of that case was merely that "section 1962(c) does not extend liability to the enterprise," id. at 30 (emphasis added). That was re-emphasized in a recent First Circuit opinion which viewed Schofield as holding merely that "[s]ection 1962(c) does not recognize corporate liability on the enterprise's part under a theory of respondeat superior." Miranda v. Ponce Federal Bank, 948 F.2d 41, 45 (1st Cir.1991) (emphasis added). Similarly, the Eighth Circuit declined to apply respondeat superior to a corporate defendant for the actions of its chief financial officer, quoting Schofield: "Both the language of [Sec. 1962(c) ] and the articulated primary motivation behind RICO show that Congress intended to separate the enterprise from the criminal 'person' or 'persons.' " Luthi v. Tonka Corp., 815 F.2d 1229, 1230 (8th Cir.1987).
 
 
 69
 The D.C. Circuit, in Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 883 F.2d 132, 140 (D.C.Cir.1989), rev'd in part on other grounds, 913 F.2d 948 (D.C.Cir.1990) (en banc ), cert. denied, --- U.S. ----, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991), adopted Haroco 's view of subsections (a) and (c) of Sec. 1962:
 
 
 70
 Through section (a), Congress provided for punishment of organizations which in fact gain from their wrongdoing by focusing on profits gleaned from illegal activities, thus "sparing" organizations that do not so profit. Section (c) likewise immunizes organizations which are merely "victims," but this result depends on the requirement of non-identity of person and enterprise which also places some corrupt organizations beyond reach.
 
 
 71
 Because of its adoption of the Schofield court's non-identity rule analysis, the Yellow Bus Lines court sided "with those courts that forbid identity of person and enterprise under Sec. 1962(c)." Id.
 
 
 72
 The Third Circuit, in Petro-Tech, Inc. v. Western Co., 824 F.2d 1349 (3d Cir.1987), reviewed a complaint in which Petro-Tech sought to recover from Western on six counts under civil RICO; Western was named as the RICO enterprise in only some of the counts. The Third Circuit held that imposing "respondeat superior and aiding and abetting liability" on a corporate defendant named as the RICO enterprise under Sec. 1962(c) "would disrupt the intended operation of Sec. 1962(c), by making the Sec. 1962(c) enterprise ... liable." Id. at 1359. However, in regard to those counts in which Western was not the Sec. 1962(c) enterprise, "theories of respondeat superior and aiding and abetting liability are not out of place," because the non-identity rule was not involved. Id. at 1361-62. The Third Circuit has also held that injunctive relief may be granted against an employer found to be a RICO enterprise, even if damages may not. United States v. Local 30, United Slate, 871 F.2d 401, 405 (3d Cir.1989).
 
 
 73
 The Ninth Circuit recently noted that there is "general agreement that respondeat superior liability is inappropriate under 18 U.S.C. Sec. 1962(c) when the enterprise and person are not distinct." Brady v. Dairy Fresh Products Co., 974 F.2d 1149, 1154 (9th Cir.1992). However, reasoning that "[r]espondeat superior and agency liability will encourage employers to monitor more closely the activities of their employees and agents to ensure that these agents are not involved in racketeering activities," id. at 1155, the Brady court held that "an employer that is benefitted by its employee or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise," id. at 1154.
 
 
 74
 The Sixth Circuit was recently faced with the question whether "ordinary principles of respondeat superior " applied to the Mutual Life Insurance Company (MONY), a group of whose employees violated Sec. 1962(c) by selling fraudulent life insurance policies. Davis v. Mutual Life Ins. Co., 6 F.3d 367, 380 (6th Cir.1993). The Davis court rejected the argument that "as a matter of law, a corporate principal may not be vicariously liable for its agents' actions in violation of section 1962(c)." Id. at 378. Finding that the cases declining to apply vicarious liability were "intertwined with the widely-embraced principle that a corporation may not be named as both a defendant 'party' and as the RICO 'enterprise,' " id., the Davis court held that those cases are not controlling "where the corporate defendant charged with vicarious liability is separate from the RICO 'enterprise.' " Id. at 379. Instead, Davis held that:
 
 
 75
 The rule to be drawn from these cases is that plaintiffs may not use RICO to impose liability vicariously on corporate "enterprises," because to do so would violate the distinctiveness requirement. No such prohibition, however, prevents the imposition of liability vicariously on corporate 'persons' on account of the acts of their agents, particularly where the corporation benefitted by those acts. Such a prohibition, if it existed, would prevent corporate persons from ever being found liable under RICO, since corporate principals may act only through their agents. Such a rule would be manifestly contrary to the intent of Congress, and we decline to adopt it.
 
 
 76
 Id. Because the RICO enterprise involved in Davis was the association of MONY employees who were engaged in the fraud, the non-identity rule was not threatened, and the court upheld the jury's finding that MONY was liable for the acts of its agents. See id. at 377-78.
 
 
 77
 Our review of the law of other circuits thus reveals that the RICO exception to the application of vicarious liability is a narrow one, created to preserve the non-identity rule, and it therefore protects only those employers who are also the RICO enterprise for purposes of Sec. 1962(c). We, of course, have squarely rejected the non-identity rule, observing that liability for the acts of one's agents "is simply a reality to be faced by corporate entities. With the advantages of incorporation must come the appendant responsibilities." United States v. Hartley, 678 F.2d 961, 989 n. 43 (11th Cir.1982). The narrow exception to vicarious liability recognized by some circuits in order to preserve the non-identity rule is, therefore, inapplicable.
 
 
 78
 Even if we had adopted the non-identity rule, however, the Union still would not be exempt from liability in this case. Although the plaintiffs have alleged that the Union is a RICO enterprise for purposes of Sec. 1962(c), they also allege that the Fairfield Works and the Fund are enterprises as well. The non-identity rule would not be threatened by holding the Union liable for its agents' corruption of the mill or the Fund.
 
 
 79
 b. Respondeat Superior Liability Under RICO
 
 
 80
 The plaintiffs argue that the Union can be held liable under general agency principles and the respondeat superior doctrine. The district court ruled against the plaintiffs on this issue, reasoning that the Union was not liable under agency principles because "the plaintiffs do not claim the Union negotiators, acting with apparent authority, made misrepresentations to them upon which they relied." The plaintiffs argue, correctly, that there is no requirement of reliance for a principal to be liable under RICO for the acts of its agent.
 
 
 81
 Since the district court entered its order, this Court spelled out the elements of respondeat superior liability for RICO violations in Quick v. People's Bank of Cullman County, 993 F.2d 793 (11th Cir.1993). Although we have rejected the "non-identity" rule, we have expressed concern that enterprises that are merely victims of the RICO violations perpetrated by their employees should not be held liable for the acts of their employees under respondeat superior. In Quick, 993 F.2d at 797-98, we held that respondeat superior liability may be applied under Sec. 1962(b) only to those enterprises that derive some benefit from the RICO violation. The Quick court also outlined the "general agency principles" to be applied in determining whether a prima facie case of vicarious liability under RICO has been made out:
 
 
 82
 Under general agency rules, a corporation (principal) will be vicariously responsible for the wrongful acts of its employees (agents) when the acts are: (1) related to and committed within the course of employment; (2) committed in furtherance [of the business] of the corporation; and (3) authorized or subsequently acquiesced in by the corporation.
 
 
 83
 Id. at 797 (quoting Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1306 (7th Cir.1987) (bracketed material in original), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989)). In Quick, we upheld the application of respondeat superior to hold a bank liable for the actions of one of its loan officers who, among other misdeeds, demanded deposits and loan payments from borrowers in cash and failed to credit them to the proper accounts. Id. at 795. Because the officer's "activities were incident to his assigned duties and took place at the Bank during business hours," we determined that the first element of vicarious liability was satisfied. Id. at 797. Because the officer's activities were related to his function of making loans, we determined that the second element was satisfied as well. Id. at 797-98. As to the third element, we determined that there was sufficient evidence the bank had acquiesced in the officer's activities because it, among other things, attempted to cover up the misconduct. Id. at 798.
 
 
 84
 In the present case, because the demand for personal pension benefits that Rich and Phillips made was incident to their duties as Union representatives in the Fairfield Works negotiations, a reasonable jury could conclude that their actions were committed in the course of their employment, so the first Quick element is satisfied. Furthermore, because the demand was related to their function of negotiating on behalf of the Union, a reasonable jury could conclude that the second element, that the action be committed in the furtherance of the business of the principal, is also satisfied. Finally, the Union's failure to investigate the allegations against Rich and Phillips or to discipline them until after their convictions, coupled with its attempt to cover up their wrongdoing, could lead a reasonable jury to find that the Union acquiesced in their misdeeds.
 
 
 85
 A union's failure to act may constitute acquiescence. In Prater v. United Mine Workers of America, 793 F.2d 1201 (11th Cir.1986), in which a union had been notified of the violent acts of some of its members, we held that "[b]y failing to take any action to stop the violence, union officials acquiesce[d] in or ratified the illegal activities of the union miners." Id. at 1210. Similarly, in Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446 (5th Cir.1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971), in which union members illegally encouraged employees of Vulcan not to report to work, we held that although a union official "may have advised Vulcan employees to return to work, he never took action which could reasonabl[y] have been expected to effectuate this end and thus can be said to have, at the very least, acquiesced in and condoned the illegal activity." Id. at 457. In Local 1814, Int'l. Longshoremen's Ass'n v. NLRB, 735 F.2d 1384 (D.C.Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), two union officials had been convicted of violating the same anti-bribery statute that Rich and Phillips have been convicted of violating. The D.C. Circuit held that "the Union's retention of [the officials] in their high controlling offices, long after the grand jury indictments had put Local 1814 on notice of their misdeeds, is tantamount to acquiescence or condonation of their unlawful acts." Id. at 1396. The Court noted that, "[u]nder such circumstances, one might reasonably have expected a truly upright union to have taken some disciplinary action." Id.
 
 
 86
 In the present case, there is no evidence the Union took any disciplinary action against Rich and Phillips, or even made any effort to investigate their actions, until after their criminal convictions. A jury could find that the Union was put on notice of the misdeeds of its negotiators: by Johnston's 1985 letter to Williams, the Union's president, informing him of the decision to change USX policy and to grant leaves of absence to six Union officials; by Johnston's 1987 letter to Williams informing him that the policy was being dropped, but that the six previously granted pension would continue to receive payments; by the allegations in the Thrasher and Sommerville suits; and by the indictment in the criminal case. A jury could therefore determine that the Union's failure to take any action against two of its negotiators, after being put on notice of their violation of the anti-bribery statute, constitutes acquiescence in their actions.
 
 
 87
 A reasonable jury could therefore find that the plaintiffs have made out a prima facie case of respondeat superior liability on the Union's part. The remaining question under Quick is whether the Union derived some benefit from the negotiators' RICO violation. In arguing that Rich and Phillips' solicitation of unearned pension credits did benefit the Union, the plaintiffs point to deposition testimony by Union president Lynn Williams, who stated that:
 
 
 88
 I believe that every employee of the Union ... that come[s] from the shops where our members work, ought to be entitled to an indefinite leave of absence so long as they serve the Union, ought to be entitled at whatever time in the future history, so long as they haven't left the Union, to go back to their original place of employment, and I disagree very much with the restrictions ... which USX has put on that all of these years in the Agreement....
 
 
 89
 So, I think that anybody, any representative that can push the leave of absence question past that and enable us to get wedges out there will enable us to move that whole leave of absence question forward, I would think in that instance, that is a good thing....
 
 
 90
 The Union argues that it did not benefit from Rich and Phillips' solicitation of pension credits for the Fairfield Six, because no pension payment was made to the Union. It dismisses the plaintiffs reliance on Williams' comments, contending that Williams was merely discussing recall rights, not pension credits, and that he did not imply that the Union would benefit by trading contract concessions for those rights. Payment to Union officers, the Union argues, "does not establish a benefit to the Union, any more than a bank could be said to benefit from a bribe of a group of its employees."
 
 
 91
 The Union's argument that it would have benefitted had USX granted recall rights to the negotiators, but did not benefit from the pension rights that were granted, is a distinction without a difference. The question is not whether the Union benefitted in some overall calculation, weighing the concessions made against the value of the pensions received. The question is whether the Union "derived some benefit from the RICO violation." Quick, 993 F.2d at 797 (emphasis added). Williams' testimony establishes that the Union benefits when one of its representatives is granted a leave of absence to work for the Union. Whether that leave confers recall rights on the employee, or pension benefits, or both, the point is that such benefits make Union representation more attractive, so that the Union has an easier time recruiting workers to serve as representatives. A jury could therefore find that the Union benefitted from the pension benefits given to its negotiators. We therefore must reject the Union's argument that the award of summary judgment can be upheld on the grounds that the Union cannot be liable for the RICO violations of its negotiators.
 
 
 92
 c. RICO Liability for Violation of Fiduciary Duty
 
 
 93
 The plaintiffs further argue that the Union is liable for the acts of its representatives because it has a fiduciary duty to the rank and file to monitor the conduct of its representatives and to remedy their illegal actions. The district court rejected that argument, reasoning that even if the Union were liable for failing to take action against Rich and Phillips, that would not make the Union liable for the negotiators' racketeering activity: "[a] breach of fiduciary duty is not, in itself, racketeering activity constituting a predicate act under RICO."
 
 
 94
 It is true that the duty of fair representation that the Union owes to its members "applies to all union activity, including contract negotiation" and is "akin to the duty owed by other fiduciaries to their beneficiaries." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 74, 111 S.Ct. 1127, 1130, 1134, 113 L.Ed.2d 51 (1991). The Union may therefore be liable for approving of, acquiescing in, or concealing a breach of trust committed by one of its employees (although we do not reach that question here). See Restatement (Second) of Trusts, Sec. 224(2)(c). As we discuss below, the existence of the fiduciary duty may also be relevant to determining the Union's liability for aiding and abetting the RICO violations of its negotiators. However, as the district court properly held, violating a fiduciary duty is not racketeering activity under 18 U.S.C. Sec. 1961(1), and cannot lead to RICO liability on the Union's part. The district court correctly rejected the plaintiff's fiduciary duty theory of liability.
 
 
 95
 d. Liability for Ratification of Agent's RICO Violations
 
 
 96
 The plaintiffs argue that the Union is liable for Rich's and Phillips' RICO violations because its failure to investigate or discipline the two and its efforts to conceal the pensions they received constitute ratification of their actions. The Union contends that it cannot be liable for the acts of its negotiators because it did not ratify their acts with "full knowledge" of the bribery scheme. The district court appears to have agreed with the Union's position. The court reasoned that the letters from Johnston, and the allegations in the Thrasher and Sommerville cases, were insufficient to give the Union knowledge that its negotiators had broken the law. Distinguishing between allegations and violations, the district court said "[t]he Union's knowledge of ... allegations of section 186 violations by Union negotiators is not the same as knowledge of section 186 violations by Union negotiators." Without evidence that the Union knew the truth of the allegations, the district court reasoned that the plaintiffs could not support their claim that the Union ratified Rich and Phillips' actions.
 
 
 97
 "A principal can ratify the unauthorized act of an agent purportedly done on behalf of the principal either expressly or by implication through conduct that is inconsistent with an intention to repudiate the unauthorized act." McDonald v. Hamilton Electric, Inc., 666 F.2d 509, 514 (11th Cir.), cert. denied, 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 144 (1982). The district court's reasoning would seem to require the plaintiffs to produce direct evidence that the Union leadership was aware that Rich and Phillips had in fact engaged in prohibited conduct. However, "proof of authorization or ratification can be based upon circumstantial evidence." James R. Snyder Co. v. Edward Rose & Sons, Inc., 546 F.2d 206, 209 (6th Cir.1976). A reasonable jury could infer that the Union's failure to act, after having been placed on notice of the negotiators' betrayal by the allegations, constituted ratification of their misconduct.
 
 
 98
 In Yellow Bus Lines, Inc. v. Local Union 639, 883 F.2d 132, 136 (D.C.Cir.1989), rev'd in part on other grounds, 913 F.2d 948 (D.C.Cir.1990) (en banc ), cert. denied, --- U.S. ----, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991), a Union president received a letter from the president of a bus company which contained allegations that Union members had committed violent acts; there was no evidence "to indicate that the union took action to investigate the allegations or to curb any excesses" of the strikers. The D.C. Circuit held that from the Union's "apparent lack of concern with the violence brought to its attention, the jury plausibly could conclude that the [Union] 'knowingly tolerated' this state of affairs. No more is required to support a finding of ratification." Id.
 
 
 99
 The situation in this case is similar to that in Yellow Bus Lines, and we find the reasoning of that case to be persuasive. Union president Williams testified that he thought it would be "a good thing" for Union representatives to "push the leave of absence question forward;" Williams received a letter from Johnston informing him of the change in USX policy and that six Union representatives had been given pensions; the Thrasher and Sommerville suits were filed, alleging that Rich and Phillips had received pensions out of the Fairfield negotiations, and Rich and Phillips were indicted for receiving the bribes. In spite of all that, the Union took no action. From the Union's failure to act, a reasonable jury could conclude that the Union "knowingly tolerated" the situation, and thereby ratified it. The same failure to take action that constitutes acquiescence for purposes of respondeat superior liability (as we concluded above in subpart II.B.3.b) is also sufficient to constitute ratification. Prater v. United Mine Workers of America, 793 F.2d 1201, 1210 (11th Cir.1986).
 
 
 100
 e. Aiding and Abetting Liability Under RICO
 
 
 101
 The plaintiffs argue that the Union is liable under RICO for aiding and abetting the RICO violations that Rich and Phillips committed, either because it failed to take any action against them or because it affirmatively covered up their misdeeds. The district court held that the Union could not be liable for aiding and abetting the actions of its representatives by virtue of " 'mere negative acquiescence,' " but instead, "there must be evidence that the Union committed an overt act designed to aide in the success of the venture." The court considered the actions taken by the Union in the Thrasher and Sommerville suits: denying the allegation that Rich, Phillips and others received pensions as a result of the Fairfield Works Agreement; and filing an affidavit by Union attorney Bernard Kleiman, denying that Rich and Phillips were retired from USX, when in fact they had retired and were receiving pensions. It held that these actions could constitute concealment subjecting the Union to liability if the responsible Union officials knew the truth about the pensions. Accordingly, the district court denied the Union's motion for summary judgment on the aiding and abetting claim, although the denial appears to be without prejudice to a renewal of the motion at the close of discovery.
 
 
 102
 One who aids and abets two predicate acts can be civilly liable under RICO. Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1356 (3d Cir.1987). To establish civil liability for aiding and abetting, the plaintiffs must show: (1) that the defendant was generally aware of the defendant's role as part of an overall improper activity at the time that he provides the assistance; and (2) that the defendant knowingly and substantially assisted the principal violation. See Schneberger v. Wheeler, 859 F.2d 1477, 1480 (11th Cir.1988), cert. denied, 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989); Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94-95 (5th Cir.1975); Halberstam v. Welch, 705 F.2d 472, 477 (D.C.Cir.1983). The defendant's "[k]nowledge may be shown by circumstantial evidence, or by reckless conduct." Woodward, 522 F.2d at 96. The same evidence that would support a jury's finding that the Union "knowingly tolerated" Rich and Phillips' actions pursuant to the plaintiffs' ratification theory (the letter from Johnston, the allegations in the Thrasher and Sommerville suits, and the criminal indictment) will also support a jury's finding that the Union was aware of its general role in the scheme.
 
 
 103
 As we have already concluded in our discussion of causation in subpart II.B.2, above, the jury could infer that the Union took steps to conceal the unearned pensions that USX awarded to the Union's negotiators. Whether those steps constitute substantial assistance is a question for the jury. The district court was therefore correct in denying the Union's motion for summary judgment on the plaintiffs' aiding and abetting claim.
 
 
 104
 f. Co-Conspirator's Liability Under RICO
 
 
 105
 The plaintiffs' final argument for Union liability is that the Union violated 18 U.S.C. Sec. 1962(d), which makes it a crime "for any person to conspire to violate any of the" other RICO provisions. (As we discussed in part II.B, above, anyone "injured in his business or property by reason of a violation of Sec. 1962" may recover treble damages.) To be adjudged liable, "each defendant in a RICO conspiracy case must have joined knowingly in the scheme and been involved himself, directly or indirectly, in the commission of at least two predicate offenses." Feinstein v. Resolution Trust Corp., 942 F.2d 34, 41 (1st Cir.1991). Proof of an agreement is "the essence of conspiracy." United States v. Bright, 630 F.2d 804, 813 (5th Cir.1980). "Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor, but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act." Id. (citations omitted). However, "[t]he existence of the conspiracy agreement does not have to be proven by direct evidence. Instead, it can be inferred from " 'the conduct of the alleged participants or from circumstantial evidence of the scheme.' " United States v. LeQuire, 943 F.2d 1554, 1562 (11th Cir.1991) (quoting United States v. Ard, 731 F.2d 718, 724 (11th Cir.1984)), cert. denied, --- U.S. ----, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). As the district court properly noted, evidence that a defendant assisted in the concealment of a conspiracy may support an inference that the defendant joined in it while it was still in operation. United States v. Gold, 743 F.2d 800, 825 (11th Cir.1984) (quoting United States v. Freeman, 498 F.2d 569, 576 (2d Cir.1974)), cert. denied, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985).
 
 
 106
 The district court reasoned that, if the plaintiffs were able to show that the Union concealed the racketeering activity of its representatives, a "jury could reasonably infer that the Union joined in while the conspiracy was still in operation," and the Union would therefore be liable. We agree. Because a jury could infer that the Union took steps to conceal Rich's and Phillips' RICO violations, a jury should decide whether the Union is liable for conspiring with them.
 
 
 107
 g. Summary of Holdings on Union Liability
 
 
 108
 We agree with the district court that the Union cannot be liable for its representatives' RICO violations under the theory that it violated a fiduciary duty to its members. However, the plaintiffs are entitled to go to trial on their claims that the Union is liable for Rich's and Phillips' RICO violations under respondeat superior, ratification, aiding and abetting, and conspiracy theories. We therefore reject the Union's argument that the award of summary judgment must be upheld because it cannot be liable under RICO.
 
 C. THE Sec. 301 CLAIM AGAINST USX
 
 109
 The plaintiffs contend that the district court erred in entering summary judgment against them on their "hybrid" claim against USX for breach of contract under Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. As the Supreme Court explained in DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476 (1983),
 
 
 110
 an individual employee may bring suit against his employer for breach of a collective-bargaining agreement. Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective-bargaining agreement.... [H]owever, we recognized that this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding. Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on Sec. 301, since the employee is alleging a breach of the collective-bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation.... The employee may, if he chooses, sue one defendant and not the other, but the case he must prove is the same whether he sues one, the other, or both.
 
 
 111
 (internal citations and quotation omitted). The plaintiffs argue that,
 
 
 112
 [b]ecause the [Fairfield Works] Agreement is void and unenforceable, USX breached its contractual obligations when USX did not pay members of plaintiff class the full compensation which they should have been paid (from 1984 to date) based on the 1983 Basic Labor Agreement, the 1987 Basic Labor Agreement, and prior practices, without regard to the [Fairfield Works] Agreement.
 
 
 113
 (The Basic Labor Agreement, between USX and the International, governs all of USX's plants in Canada and the United States, in the absence of local agreements.) The district court rejected the claim on the same ground on which it rejected the RICO claim--that "the court can find no evidence of record from which a jury could conclude that the concessions in the FWA were given in exchange for the pensions." Having decided that a jury could infer that the Fairfield Works Agreement is more concessionary than it would have been had the Union negotiators not solicited and received unearned pension benefits (in subpart II.B.2, above), we cannot agree with the district court's reasoning or affirm its order granting summary judgment on that basis.
 
 
 114
 USX argues that we should affirm the grant of summary judgment on the alternative ground--which the district court rejected--that the plaintiffs' Sec. 301 claim was not timely brought. In DelCostello, the Supreme Court held that the 6-month statute of limitations from Sec. 10(b) of the National Labor Relations Act should be applied to Sec. 301 suits. 462 U.S. at 169, 103 S.Ct. at 2293. The district court, applying a discovery rule, held that the suit was timely brought, because the defendants were unable to show that the plaintiffs should have uncovered adequate grounds for filing suit prior to six months before the suit was actually filed in December 1988. On appeal, USX argues that our decision in Hill v. Texaco, Inc., 825 F.2d 333 (11th Cir.1987), precludes the application of a discovery rule to actions brought pursuant to a Sec. 10(b) statute of limitations period. In that case, we observed that principles of equitable tolling "cannot be applied in the face of contrary congressional intent." Id. at 334. According to USX, because Sec. 10(b) states that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge," it would be contrary to Congressional intent to apply equitable tolling principles to a Sec. 301 suit. However, we have already held that the discovery rule applies to claims under Sec. 301: "Generally, a cause of action accrues under Sec. 301, and the statute of limitations begins to run, when in the exercise of reasonable diligence the claimant knew or should have known of the injury." Hill v. Georgia Power Co., 786 F.2d 1071, 1074-75 (11th Cir.1986) (emphasis added); see also Santiago v. Lykes Bros. S.S. Co., 986 F.2d 423, 427 n. 3 (11th Cir.1993). We are, of course, bound by these prior decisions. The district court's refusal to grant summary judgment on the ground of timeliness was therefore entirely correct.
 
 
 115
 USX also argues that summary judgment is proper on the alternative ground that the plaintiffs' Sec. 301 claim is meritless, because "operations in accordance with consensual modifications" to the Basic Labor Agreement cannot be a breach of contract. In USX's view, the plaintiffs' claim is one against the Union for breach of the duty of fair representation in signing a bad contract, not against the Company: "where, as here, the duty of fair representation claim is based upon a breach of duty in negotiating a labor agreement, no Sec. 301 employer contract breach is implicated at all." However, the plaintiffs do not allege merely that Rich and Phillips negotiated a bad deal, and we have already concluded that a reasonable jury could infer that USX took advantage of Rich's and Phillips' willingness to pursue personal gain by signing a more concessionary Fairfield Works Agreement than they otherwise would have. And, "[o]f course, a bargain by which a fiduciary takes advantage of his position to profit at the expense of the beneficiary is fraudulent and is voidable by the beneficiary." 6A Arthur Corbin, Corbin on Contracts, Sec. 1456, at 534 (1962). Rich and Phillips were fiduciaries of the rank-and-file union membership; the Supreme Court has held that the "duty of fair representation" a Union owes to its members "is ... akin to the duty owed by other fiduciaries to their beneficiaries." Airline Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 74, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 (1991). The Agreement is therefore voidable.
 
 
 116
 That does not mean, however, that the plaintiffs are entitled to recover the difference between what they were paid under the Fairfield Works Agreement and what they would have been paid under the Basic Labor Agreement. Upon rescinding a voidable contract, the plaintiffs are entitled "to the reasonable value of a performance rendered" to the Company. 6A Corbin, Sec. 1535, at 822. "Reasonable value" is determined by the marketplace, free of illegitimate taint. It is clear that the rates provided for in the Basic Labor Agreement are not the reasonable market value the plaintiffs would have received for their labors, because it is undisputed that USX had shut down the facility rather than pay those rates. Instead, the proper measure of the value of the work done is the value that the parties would have agreed upon had the Union negotiators not violated their fiduciary duty. In other words, if a jury finds that the contract was voidable, the plaintiffs are entitled to recover the value of the concessions that the Union negotiators would have extracted from the company if the negotiators had not been pursuing their personal pension benefits.
 
 III. THE ISSUES RELATING TO DISCOVERY
 
 117
 The Union and USX both appeal from orders of the district court rejecting their invocation of the attorney-client privilege during discovery. In the interlocutory appeal and in the appeal of summary judgment on the RICO claim, the plaintiffs complain of limits the district court has placed on their discovery efforts. The areas of discovery affected by the limits may be grouped into four categories: USX pension practices at other plants; grand jury materials; attorney work-product; and limiting the deposition of USX and Union attorneys to written interrogatories.
 
 
 118
 The Union argues that the plaintiffs failed properly to raise the issues in the district court. According to the Union, the plaintiffs should not be allowed to appeal the limitations on their discovery efforts because the plaintiffs failed to request further discovery into the four areas in either of its Rule 56(f) motions.[4] (The plaintiffs did request further discovery of the attorney-client communications and we discuss those requests below.) However, we cannot agree that the plaintiffs should have included the issues in their Rule 56(f) motions. As the plaintiffs' observe, it would not make sense to require them to request "deferral of the summary judgment motions until plaintiffs could complete discovery which the district court already denied." Having raised the issues below, and having appealed from the entry of final judgment, the plaintiffs are entitled to raise the issues on appeal.
 
 A. STANDARD OF REVIEW
 
 119
 To the extent that the appeals involve mixed questions of law and fact, regarding the applicability of the attorney-client privilege to particular communications that the plaintiffs wish to discover, our review is plenary. In re Grand Jury Matter No. 91-01386, 969 F.2d 995, 997 (11th Cir.1992); In re Grand Jury Proceedings 88-9 (MIA), 899 F.2d 1039, 1042 (11th Cir.1990). Otherwise, matters of discovery and evidence are committed to the discretion of the district court. Wu v. Thomas, 996 F.2d 271, 275 (11th Cir.1993); Lee v. Etowah County Bd. of Educ., 963 F.2d 1416, 1420 (11th Cir.1992). Discovery orders should not be overturned "unless the district court has abused its discretion and such abuse has resulted in substantial harm to the party seeking relief." Arabian American Oil Co. v. Scarfone, 939 F.2d 1472, 1477 (11th Cir.1991).
 
 B. THE UNION'S ATTORNEY-CLIENT PRIVILEGE
 
 120
 The district court determined that the Union could not assert the attorney-client privilege against the plaintiffs to prevent them from discovering the content of Union President Williams' discussion with the Union's attorneys regarding USX's change in its leave of absence policy. Although the court rejected the plaintiffs' argument that the crime-fraud exception to the attorney-client privilege applies, it accepted their argument that the Garner doctrine prevents the Union from invoking the privilege against the plaintiffs, to whom, as members, the Union owes a fiduciary duty.
 
 
 121
 According to Federal Rule of Evidence 501, "the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The attorney-client privilege, "the oldest of the privileges for confidential communications known to the common law," United States v. Zolin, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989) (quoting Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981)), protects the disclosures that a client makes to his attorney, in confidence, for the purpose of securing legal advice or assistance. In re Grand Jury (G.J. No. 87-03-A), 845 F.2d 896, 897 (11th Cir.1988). Based on the theory that "sound legal advice or advocacy ... depends upon the lawyer's being fully informed by the client," the privilege is designed "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn, 449 U.S. at 389, 101 S.Ct. at 682. Despite its value in encouraging clients to confide in their counsel, we have recognized that, as " 'an obstacle to the investigation of the truth,' " the privilege is not without exceptions. Garner v. Wolfinbarger, 430 F.2d 1093, 1101 (5th Cir.1970) (quoting 8 Wigmore, Evidence, Sec. 2291, at 554), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971).
 
 1. The Garner Doctrine
 
 122
 The Garner court determined that shareholders suing their corporation may discover communications otherwise protected by the attorney-client privilege upon a showing of good cause. The Garner court observed that "management does not manage for itself and that the beneficiaries of its action are the stockholders." Id. at 1101. It is, therefore, "difficult to rationally defend the assertion of the privilege if all, or substantially all, stockholders desire to inquire into the attorney's communications with corporate representatives who have only nominal ownership interests, or even none at all." Id. However, Garner recognized that "the complete removal of the attorney-client privilege from the grasp of the corporation client ... would expose corporations to harassment suits by minority stockholders and a possible deterioration of candid attorney-client communication and effective corporate management." Cohen v. Uniroyal, Inc., 80 F.R.D. 480, 483 (E.D.Pa.1978). Garner therefore does not eliminate the privilege altogether "merely because those demanding information enjoy the status of stockholders." Garner, 430 F.2d at 1103. Rather, stockholders are given the opportunity "to show cause why [the privilege] should not be invoked in the particular instance." Id. at 1104. The Garner panel listed nine factors to be considered in determining whether good cause has been shown:
 
 
 123
 the number of shareholders [seeking discovery] and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.
 
 
 124
 Id.
 
 
 125
 The plaintiffs argue that the Garner doctrine applies to a union's assertion of the attorney-client privilege against its members. See Nellis v. Air Line Pilots Ass'n, 144 F.R.D. 68, 71 (E.D.Va.1992) (holding that the Garner doctrine applies because unions owe a fiduciary duty to their members under Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 74, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 (1991)); Aguinaga v. John Morrell & Co., 112 F.R.D. 671, 681 (D.Kan.1986) (holding that the Garner doctrine applies to unions because "union officials' association with their members possesses all the essential characteristics of a fiduciary relationship"); Boswell v. International Bhd. of Elec. Workers Local 164, 106 L.R.R.M. (BNA) 2713, 1981 WL 27188 (D.N.J.1981) (applying Garner to suit brought by union member against union). The Union urges that we adopt the Ninth Circuit's reading of Garner in Weil v. Investment/Indicators Research and Management, Inc., 647 F.2d 18, 23 (9th Cir.1981), that "Garner 's holding and policy rationale simply do not apply" outside the context of the shareholder derivative suit. Alternatively, the Union argues that the plaintiffs have failed to show good cause, because they are a small percentage of the Union's membership, seeking damages from the Union for themselves, and have shown no need to know what legal advice Williams received.
 
 
 126
 The district court determined that the Garner doctrine should apply to the Union, because Garner was premised "on the view that corporate management owed fiduciary duties to the stockholders of the corporation," and because "the relationship between union and union members" likewise "has fiduciary overtones." The court then determined that the plaintiffs had shown good cause, because "the plaintiff class here is a significant percentage of the total Union membership," and "the plaintiffs' suit advances the general membership's interest in providing a check on the Union's proper discharge of its fiduciary duties to the members." The court also noted that the plaintiffs' claim was colorable, that they had identified the specific communication that they wished to discover, that no trade secret is involved, and that there is no other source "from which plaintiffs might gain the same information."
 
 
 127
 Because we hold that even if the Garner doctrine applies, it does not support an exception to the attorney-client privilege under the facts of this case, we need not decide whether the Garner doctrine does apply to disputes between a union and its members. We do note that the Fifth Circuit has firmly rejected "the Ninth Circuit's narrow interpretation of the types of suits covered by Garner." Ward v. Succession of Freeman, 854 F.2d 780, 786 (5th Cir.1988) (citing In re International Sys. & Controls Corp. Sec. Litig., 693 F.2d 1235, 1239 n. 1 (5th Cir.1982)), cert. denied, 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989). However, in applying Garner to suits brought by shareholders seeking to recover for themselves at the corporation's expense, the Fifth Circuit:
 
 
 128
 recognize[d] reason in the Weil holding: Where shareholders bring a successful derivative action on behalf of the corporation, they benefit all shareholders. Where, however, shareholders seek to recover damages from the corporation for themselves, they do not even seek a gain for all others. In the latter circumstance, the motivations behind the suit are more suspect, and thus more subject to careful scrutiny, in determining if good cause for suspending the privilege exists.
 
 
 129
 Id. at 786. After applying that "careful scrutiny," the Ward court determined that the plaintiffs had failed to show good cause; one of the reasons given was that the "[p]laintiffs cumulatively owned less than four [percent] of the stock in LA Coke." Id.
 
 
 130
 Even assuming the Garner doctrine applies to unions, on the facts of this case discovery of the attorney-client communications should not be allowed. Although many of the factors listed in Garner appear to support the plaintiffs' argument that there is good cause for discovery, two factors foreclose it: the fact that only a tiny percentage of the defendant Union's members are members of the plaintiff class; and the fact that the interest of the plaintiff class is adverse to those who are not in the class. Compare Ward, 854 F.2d at 786 (fact that plaintiffs owned less than four percent of stock weighs against finding of good cause) with Fausek v. White, 965 F.2d 126, 133 (6th Cir.) (fact that plaintiffs own 40% of corporation's stock weighs for finding good cause), cert. denied, --- U.S. ----, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992). Garner recognized that, in a shareholder derivative suit, which the plaintiffs bring on behalf of the corporation, "it is difficult to rationally defend the assertion of the privilege if all, or substantially all, stockholders desire to inquire into the attorney's communications with corporate representatives." 430 F.2d at 1101 (emphasis added). This case, however, is unlike the shareholder derivative suit in Garner, because the plaintiff class in this case consists of only about one-half of one percent of the international union's membership. The plaintiffs argue that the district court's assertion that the plaintiff class represents "a significant percentage of the total Union membership" can be defended on the ground that the class "represents practically one hundred percent of the USX employees at [the Fairfield] Works who are covered by the [Fairfield] Agreement." The problem with that reasoning is that the lawsuit was not filed against the local union that represents only Fairfield workers; it was filed against the international union. Moreover, the attorney-client communication in question was not to an officer of the local union but to an officer of the international union. Therefore, the proper measure of significance for the plaintiff class is in terms of the national union, whose membership is so large that it dwarfs the size of the plaintiff class.
 
 
 131
 This case is also unlike the shareholder derivative suit in Garner, and is unlike the shareholders' suit against a chief executive officer in Fausek, because there is no identity of interests between the plaintiffs and the non-plaintiff Union members. Instead, their interests are adverse. The plaintiffs in the present case seek damages not on behalf of the Union, but for their personal benefit at the expense of the Union and its other members. Their interests are directly adverse to those of the other Union members. Garner noted that "[d]ue regard must be paid to the interests of nonparty stockholders, which may be affected by impinging on the privilege." Id. at 1101 n. 17. Where such a small fraction of the Union's membership seeks to pierce the attorney-client privilege at the expense of the remaining ninety-nine and one-half percent, "due regard" for the interest of the non-party members requires that the plaintiffs' request be rejected.
 
 2. The Crime-Fraud Exception
 
 132
 The plaintiffs argue in the alternative that the district court's order compelling Williams's testimony can be upheld under the crime-fraud exception to the attorney-client privilege, because "the Union by its counsel" subsequently made numerous false statements about the pension status of its negotiators, as part of an effort to conceal their illegal actions. The district court rejected this argument because "there is no evidence showing the communication furthered any crime or fraud, or ... was connected with any crime or fraud."
 
 
 133
 To determine whether the crime-fraud exception applies, we employ a two-part test laid out in In re Grand Jury Investigation (Schroeder), 842 F.2d 1223, 1226 (11th Cir.1987):
 
 
 134
 First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.
 
 
 135
 Accord, In re Federal Grand Jury Proceedings, 89-10 (MIA), 938 F.2d 1578, 1581 (11th Cir.1991).
 
 
 136
 While the plaintiffs' evidence of the existence of Union cover-up may satisfy the first prong of the test, we agree with the district court that they have failed to satisfy the second. The purpose of the second prong is to identify "communications that should not be privileged because they were used to further a crime or a fraud." Schroeder, 842 F.2d at 1227. Although that determination "must take into account that the [party seeking discovery] does not know precisely what the material will reveal or how useful it will be," id., "[t]here is no reason to permit opponents of the privilege to engage in groundless fishing expeditions," U.S. v. Zolin, 491 U.S. 554, 571, 109 S.Ct. 2619, 2630, 105 L.Ed.2d 469 (1989).
 
 
 137
 Before engaging in in camera review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.
 
 
 138
 Once that showing is made, the decision whether to engage in in camera review rests in the sound discretion of the district court.
 
 
 139
 Id. at 572, 109 S.Ct. at 2631 (internal citations and quotation omitted). The plaintiffs have failed to produce any evidence that Williams's communications with the Union's attorneys regarding the Johnston letter furthered or were closely related to an effort on the Union's part to conceal the illegal actions of its negotiators. They have therefore failed to show that the district court abused its discretion in refusing to permit even an in camera review of the communications involved.
 
 3. Waiver
 
 140
 Finally, the plaintiffs argue that the Union waived the attorney-client privilege by allowing counsel Kleiman to testify in the criminal trial, and by filing Kleiman's affidavits in lawsuits brought by Union representatives who did not receive pensions. At the criminal trial, Kleiman testified about the receipt of the letter from Johnston, and what he did in response; Kleiman did not testify as to the conversation he had with Williams about the letter. The district court reasoned that the Union did not waive the privilege because Kleiman did not disclose any confidential communications.
 
 
 141
 The attorney-client privilege "belongs solely to the client," and the client may waive it, either expressly or by implication. In re Von Bulow, 828 F.2d 94, 100, 101 (2d Cir.1987). We have observed that the doctrine of waiver by implication reflects the position that the attorney-client privilege " 'was intended as a shield, not a sword.' " GAB Business Services, Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir.1987) (applying Florida law) (quoting Pitney-Bowes, Inc. v. Mestre, 86 F.R.D. 444, 446 (S.D.Fla.1980)). In other words, "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.), cert. denied --- U.S. ----, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); accord United States v. Jones, 696 F.2d 1069, 1072 (4th Cir.1982) ("Selective disclosure for tactical purposes waives the privilege.").
 
 
 142
 The plaintiffs' position appears to be that, having allowed Kleiman to testify about the Johnston letter and the pension status of the Union's negotiators, the Union impliedly waived the privilege as to Williams's communications with Kleiman on the subject. There is support for that position in the version of the implied waiver rule suggested in Wigmore's treatise: "[t]he client's offer of his own testimony as to specific facts about which he has happened to communicate with the attorney is not a waiver.... But his offer of the attorney's testimony as to such specific facts is a waiver," and "a waiver at a first trial should suffice as a waiver for a later trial." 8 Wigmore, Evidence Sec. 2298, at 638, 639 (McNaughton rev. 1961) (penultimate emphasis added). Wigmore bases the distinction between the client offering testimony on a subject, and the attorney doing the same, on his view that "the attorney ought in general not to be used as a witness." Id. at 637.
 
 
 143
 However, Wigmore's broad version of the rule goes beyond the considerations of fairness that have motivated the application of the rule; courts generally have not found a waiver where the party attacking the privilege has not been prejudiced:
 
 
 144
 The great weight of authority holds that the attorney-client privilege is waived when a litigant places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.
 
 
 145
 Conkling v. Turner, 883 F.2d 431, 434 (5th Cir.1989) (emphasis added) (internal quotation omitted); see also United States v. Aronoff, 466 F.Supp. 855, 863 (S.D.N.Y.1979) (finding no waiver where party attacking privilege alleges no prejudice); Goldman, Sachs & Co. v. Blondis, 412 F.Supp. 286, 288 (N.D.Ill.1976) (observing that "it is a uniform rule that when a party's conduct reaches a certain point of disclosure, fairness requires that the privilege cease" (emphasis added)); Wender v. United Services Automobile Ass'n, 434 A.2d 1372, 1374-75 (D.C.1981) (basing waiver analysis on considerations of fairness); State v. Von Bulow, 475 A.2d 995, 1007 (R.I.) (citing Aronoff and basing implied waiver analysis on considerations of fairness), cert. denied, 469 U.S. 875, 105 S.Ct. 233, 83 L.Ed.2d 162 (1984). In Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir.), cert. denied, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982), the Eighth Circuit observed that "[c]ourts have found waiver by implication" in three sets of circumstances: "[ (1) ] when a client testifies concerning portions of the attorney-client communication, [ (2) ] when a client places the attorney-client relationship directly at issue, and [ (3) ] when a client asserts reliance on an attorney's advice as an element of a claim or defense." (Internal citations omitted). As a district court in our Circuit has observed:
 
 
 146
 "[a]ll of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party."
 
 
 147
 Pitney-Bowes, Inc. v. Mestre, 86 F.R.D. 444, 447 (S.D.Fla.1980) (quoting Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D.Wash.1975)).
 
 
 148
 Because the plaintiffs have failed to explain how they have been prejudiced by any of the actions taken by the Union's lawyers in the criminal case, we decline to find that the Union has impliedly waived its privilege. See Remington Arms Co. v. Liberty Mutual Ins. Co., 142 F.R.D. 408, 415 (D.Del.1992) (holding that the "Court cannot justify finding a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant").
 
 
 149
 Because the attorney-client privilege is not rendered inapplicable by the Garner doctrine or the crime-fraud exception, and because it was not waived, the ruling of the district court granting the plaintiff's motion to compel William's testimony is therefore reversed.
 
 C. USX'S ATTORNEY-CLIENT PRIVILEGE
 
 150
 In the proceedings before the district court, USX has consistently taken the position that "[a]t the time the revised leave-of-absence policy was implemented in October, 1984, ... USX believed the policy to be lawful." Memorandum of USX Corporation and United States Steel and Carnegie Pension Fund In Support of Their Motion To Dismiss, April 3, 1989, at 5; see also Pretrial Order at 5. Although USX has denied any intent to assert a defense of advice of counsel or to rely on any privileged attorney-client communications in its defense, the district court observed that "USX's defense ... necessarily implicates all of the information at its disposal when it made the decision to change the leave of absence policy and later, to rescind the change." Reasoning that "it would be inequitable to allow USX to present evidence tending to show that it intended to comply with the law, while allowing it to cloak in privilege those documents tending to show it might have known its actions did not conform to the law," the district court held that USX waived the attorney-client privilege with regard to such communications.
 
 
 151
 USX argues that it was the plaintiffs who injected the issue of USX's "state of mind" into the case by including allegations of intentional, criminal wrongdoing in their complaint. Because 29 U.S.C. Sec. 186, the criminal statute that the plaintiffs claim USX violated, contains a component of "willfulness," USX argues that it has merely denied the plaintiffs' allegations, and that a mere denial of mens rea should not constitute waiver of the attorney-client privilege.
 
 
 152
 As we discussed in the previous section, the attorney-client privilege " 'was intended as a shield, not a sword.' " GAB Business Services, Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir.1987) (quoting Pitney-Bowes, Inc. v. Mestre, 86 F.R.D. 444, 446 (S.D.Fla.1980)). USX waives the privilege if it injects into the case an issue that in fairness requires an examination of otherwise protected communications. Id. In Conkling v. Turner, 883 F.2d 431, 434-35 (5th Cir.1989), the plaintiff claimed that the RICO statute of limitations period was tolled because he did not know that a statement made by the defendants was false until told by his attorney 18 years after the fact. The Fifth Circuit held that by doing so, he waived the privilege as to communications from his attorney about the statement; "the attorney-client privilege is waived when a litigant 'place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.' " Id. at 434 (quoting Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D.Wash.1975)) (alteration in original). See also Lorenz v. Valley Forge Ins. Co., 815 F.2d 1095, 1098 (7th Cir.1987) ("To waive the attorney-client privilege ... a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case."); Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir.) ("[B]y asserting fraud, [the defendant] ... waived his right to assert the privilege to prevent disclosure of communications which might have proven he did not rely on [the plaintiffs'] statements."), cert. denied, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). The defendant need not raise an affirmative defense to inject a new issue into the case, although it frequently occurs that way. Cf. Lorenz, 815 F.2d at 1098 (stating that new issues are "[m]ost often" injected "through the use of an affirmative defense").
 
 
 153
 United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991), although a criminal case, is instructive. Prior to his trial for securities fraud, Bilzerian announced his intention to testify that he believed in good faith that certain disclosures he made to the Securities and Exchange Commission were legal. The district court ruled that if he were to do so, he would waive the attorney-client privilege with respect to those communications with his counsel regarding the legality of his actions. Bilzerian therefore declined to assert his good faith belief. He was convicted, and he challenged the conviction, arguing that the district court had prevented him from denying criminal intent--an essential element of the crime with which he was charged. The Second Circuit rejected his argument, reasoning that:
 
 
 154
 Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.
 
 
 155
 Id. The court held that Bilzerian had not been deprived of the right to deny criminal intent; he "was free to deny criminal intent ... without asserting good faith." Id. at 1293.
 
 
 156
 Similarly, in the present case, USX could have denied criminal intent without affirmatively asserting that it believed that its change in pension fund policy was legal. Having gone beyond mere denial, affirmatively to assert good faith, USX injected the issue of its knowledge of the law into the case and thereby waived the attorney-client privilege.
 
 
 157
 The district court ordered the disclosure of those attorney-client communications bearing on USX's knowledge of the law relating to its leave of absence policy, from the date Rich and Phillips first proposed the payments to May 22, 1988 (the date the Company ceased making direct payments to the Fairfield Six). USX argues that because the Company admits it was not certain of the plan's legality after the Third Circuit's 1986 decision in Trailways Lines, Inc. v. Trailways, Inc., 785 F.2d 101 (3d Cir.), cert. denied, 479 U.S. 932, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986), the waiver should only apply to communications made before that date. We cannot say, however, that the district court abused its discretion in determining that the communications USX had with its attorneys, after Trailways and prior to its decision to cease making direct payments, might bear on what USX knew about the legality of the plan, and when USX knew it. Accordingly, the order of the district court is affirmed.
 
 
 158
 D. PLAINTIFFS' ATTEMPT TO OBTAIN DISCOVERY OF PENSION
 
 PRACTICES AT OTHER PLANTS
 1. The Parton Matter
 
 159
 The district court granted the defendants' motion for a protective order preventing the plaintiffs from deposing twelve people to inquire about Jack Parton, a Union negotiator at USX's Gary, Indiana, plant. According to the plaintiffs, Parton was granted a series of one-year leaves of absence beyond USX's two-year limit, so that he too earned pension credit at USX while working for the Union, and thus discovery should be allowed so they can show that his case is part of USX's pattern of RICO violations.
 
 
 160
 The district court determined that it could "find no relationship and no substantial similarity between the Parton matter and the incidents at the Fairfield Works that are the subject of this lawsuit." We disagree. The plaintiffs have produced evidence showing that the manager of employee relations at the Gary Works promised, in the final hours of negotiations on local issues there, to "take care of" Parton should he be reelected to his position within the Union. Internal USX memoranda reveal that Johnston initially refused to agree to the request; however, on November 18, 1983 (the month before he agreed that Rich and Phillips' request would be considered favorably), Miller granted Parton an extension on his leave of absence. While the district court retains the power to grant a protective order when the information sought in a deposition clearly would be irrelevant, Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir.1979), "relevance is broadly defined in the context of discovery," Wyatt v. Kaplan, 686 F.2d 276, 284 (5th Cir.1982). The Parton matter is plainly relevant to plaintiffs' efforts to establish a pattern of RICO violations. The order of the district court is therefore reversed.[5] The district court does retain its authority to keep discovery about the Parton matter within reasonable bounds.
 
 2. Negotiations at Other Plants
 
 161
 The district court also denied the plaintiffs' request that the defendants produce virtually all documents relating to USX business plans for negotiations with the Union at other USX facilities from 1980 to the present. The plaintiffs argue that such an inquiry is necessary so that they can address the defendants' contention that the concessions in the Fairfield agreement were the result of economic necessity rather than the bribes. The district court found that the request was unduly burdensome, particularly given the fact that "[a]greements at other plants present uncontrollable variables resulting from differences in size, location, equipment, productivity, and other unknowable factors, which makes the collective bargaining process unique to each plant. A comparison of the bargaining results between plants is, therefore, the proverbial comparison of apples and oranges." USX characterizes the plaintiffs' request as an overwhelmingly burdensome fishing expedition, and objects on the ground that the documents requested contain business secrets.
 
 
 162
 "Where a significant amount of discovery has been obtained, and it appears that further discovery would not be helpful in resolving the issues, a request for further discovery is properly denied." Avirgan v. Hull, 932 F.2d 1572, 1580 (11th Cir.1991). By any measure, the plaintiffs have had a significant amount of discovery in this case. The plaintiffs were allowed discovery of those of USX's business plans that were related to the Fairfield Works; they have taken 36 depositions and have received over 50,000 documents from USX alone. Limitations on the scope of discovery are "appropriate when discovery would burden the party from whom it is sought unduly, in comparison with any advantage it would provide to the discovering party ... because a particular matter is of only minor importance." Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Sec. 2040, at 286 (1970). We have already held, in subpart II.B.2 above, that the plaintiffs do not need to show that the prevailing economic conditions had no effect on the negotiations. The substantial burden that the requested discovery would have on the defendants therefore far outweighs any benefits plaintiffs would gain by being able to present a comparison of the results of the Fairfield negotiations to those at other plants. The district court's order denying that discovery was not an abuse of discretion, and it is affirmed.
 
 E. THE GRAND JURY MATERIALS
 
 163
 The district court also denied the plaintiffs' motion to compel production of testimony and documents presented to the grand jury in the criminal case. The plaintiffs argue that because the defendants have in their possession a copy of all of the documents and transcripts of all of the testimony presented to the grand jury, and the defendants' witnesses have been uncooperative, they need access to the materials. The plaintiffs also argue that the defendants' interest in preserving the secrecy of the material is minimal, given that the criminal trial is over.
 
 
 164
 In the proceedings of November 28, 1990, the district court emphasized that its denial of the plaintiffs' motion "does not preclude [the plaintiffs] from renewing the motion with a specific showing of need.... I didn't feel that you made the particularized showing on any of those grand jury proceedings in order to" compel discovery. It has long been the law of this Circuit
 
 
 165
 that disclosure of grand jury testimony is properly granted where there is a compelling need for such disclosure and such disclosure is required by the ends of justice. Disclosure even in these circumstances must be closely confined to the limited portions of the testimony for which there is found to be a particularized need.
 
 
 166
 Allis-Chalmers Mfg. Co. v. City of Fort Pierce, 323 F.2d 233, 242 (5th Cir.1963) (emphasis added). The plaintiffs have made no effort to identify those portions of the grand jury transcripts for which they have a particularized need. Given the opportunity to renew the motion upon a showing of such need, the plaintiffs are unable to demonstrate that the court's order "resulted in substantial harm" warranting a determination that the court abused its discretion. Arabian American Oil Co. v. Scarfone, 939 F.2d 1472, 1477 (11th Cir.1991). The district court did not abuse its discretion, and its order is affirmed.
 
 F. ATTORNEY WORK PRODUCT
 
 167
 The plaintiffs moved to compel discovery of one document produced by USX attorneys concerning the leave of absence policy, and several documents produced by Union attorneys, relating to statements made by the Fairfield Six or by Emmett Bruce Thrasher that relate to matters in the litigation. They also moved to compel an answer to an interrogatory asking the Union to identify each statement taken by its attorneys during their investigation into requests by Union officials for USX pensions. The district court denied the motions and sanctioned the plaintiffs for bringing them; the plaintiffs appeal that order.
 
 
 168
 The attorney work-product privilege traces its roots to the recognition by the Supreme Court, in Hickman v. Taylor, 329 U.S. 495, 510-11, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947), that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." The privilege is presently codified in Fed.R.Civ.P. 26(b)(3), which provides, in part:
 
 
 169
 (3) Trial Preparation: Materials.... [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
 
 
 170
 Material that reflects an attorney's mental impressions, conclusions, opinions, or legal theories, is referred to as "opinion work product." In re Murphy, 560 F.2d 326, 336 (8th Cir.1977); cf. Hickman, 329 U.S. at 511, 67 S.Ct. at 393; Upjohn Co. v. United States, 449 U.S. 383, 399, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981). "Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." Hickman, 329 U.S. at 510, 67 S.Ct. at 393. In Upjohn, the Supreme Court made clear that an attorney's notes and memoranda of a witness's oral statements is considered to be opinion work product. Upjohn, 449 U.S. 383, 399-400, 101 S.Ct. 677, 687-88, 66 L.Ed.2d 584 (1981). As Rule 26(b)(3) makes apparent, "opinion work product can not be discovered upon a showing of substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." Murphy, 560 F.2d at 336; see also National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc., 967 F.2d 980, 983 (4th Cir.1992); In re Sealed Case, 676 F.2d 793, 809-10 (D.C.Cir.1982). Instead, "opinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances." Murphy, 560 F.2d at 336.
 
 
 171
 The crime-fraud exception presents one of the rare and extraordinary circumstances in which opinion work product is discoverable. The exception applies to work-product in the same way that it applies to the attorney-client privilege. In re International Sys. & Controls Corp. Sec. Litig., 693 F.2d 1235, 1242 (5th Cir.1982); see also In re Antitrust Grand Jury, 805 F.2d 155, 164 (6th Cir.1986); Sealed Case, 676 F.2d at 812; In re John Doe Corp., 675 F.2d 482, 492 (2d Cir.1982); In re Grand Jury Proceedings (FMC Corp.), 604 F.2d 798, 803 (3d Cir.1979). Before the crime-fraud exception will be invoked, the plaintiffs must satisfy the two-part test of In re Grand Jury Investigation (Schroeder), 842 F.2d 1223, 1226 (11th Cir.1987), which we discussed in subpart III.B, above. See also In re Federal Grand Jury Proceedings 89-10 (MIA), 938 F.2d 1578, 1581 (11th Cir.1991). Even if the Union engaged in an effort to conceal the unlawful activities of its negotiators, as a jury might find (see subpart II.B.2, above), after our own in camera inspection, we agree with the district court that the documents in question were not created to further any crime or fraud; nor are they closely related to any.
 
 
 172
 The remaining two grounds on which the plaintiffs argue for reversal are not among the very rare and extraordinary circumstances in which opinion work product is discoverable. First, the plaintiffs argue that USX waived the privilege by asserting that it thought its actions were legal, and the Union waived the privilege by allowing one of its attorneys, Kleiman, to testify at the criminal trial and by asserting that it was unaware of Rich and Phillips' actions. The subject-matter waiver doctrine provides that a party who injects into the case an issue that in fairness requires an examination of communications otherwise protected by the attorney-client privilege loses that privilege. GAB Business Services, Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir.1987). However, as the Fourth Circuit has observed in In re Martin Marietta Corp., 856 F.2d 619, 625-26 (4th Cir.1988), cert. denied, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989), the subject-matter waiver doctrine does not extend to materials protected by the opinion work product privilege. The Martin Marietta court's reasoning was that the plain language of Fed.R.Civ.P. 26(b)(3) suggests that opinion work product should not be subject to such an implied waiver, and that the rationale behind the doctrine (the fear that a party might " 'make affirmative testimonial use' " of a communication and then seek to shield it from disclosure) does not apply to mental impressions and legal theories. Id. at 626 (quoting Duplan Corp. v. Deering Milliken, Inc., 540 F.2d 1215, 1223 (4th Cir.1976)). We agree. Where a party asserts that he believed his actions to be lawful, he waives the attorney-client privilege as to what his attorney told him about the legality of his actions (see subpart III.C, above); his attorney's work product, however, is a different matter.
 
 
 173
 The plaintiffs also argue that the Garner doctrine applies to work product. Garner v. Wolfinbarger, 430 F.2d 1093, 1103-04 (5th Cir.1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), held that shareholders suing their corporation may discover communications otherwise protected by the attorney-client privilege upon a showing of good cause. The plaintiffs seek to extend that holding to apply to the relationship between the workers at the Fairfield plant and their Union and their pension fund, as well as to the work product privilege. However, the Fifth Circuit has held that the Garner doctrine does not apply to attorney work product. In re International Sys. & Controls Corp., 693 F.2d 1235, 1239 (5th Cir.1982) (footnotes omitted). We agree. Furthermore, at least as far as the Union is concerned, we have already held, in III.B above, that the Garner exception is not justified on the facts of this case. The district court therefore did not abuse its discretion, and its order is affirmed.
 
 G. RULE 31 DEPOSITION OF ATTORNEYS
 
 174
 The final discovery order that the plaintiffs appeal is the sua sponte ruling of the district court, pursuant to Rule 31, that the plaintiffs may depose the defendants' attorneys only by written questions. The plaintiffs argue that they should be allowed to take oral depositions, citing the hostility of the witnesses and the defendants' efforts at concealment. The district court reasoned that, "[i]n view of the plaintiffs' continuing efforts to breach the defendants' attorney-client privilege, the court is convinced that these depositions, in the absence of firm control by the court, will almost certainly be attended by continuing disputes and may require that they be supervised by a judicial officer." That order was not an abuse of discretion, and we affirm it.
 
 IV. CLASS CERTIFICATION
 
 175
 The district court declined to certify the plaintiff class for the plaintiffs' claims for equitable relief, and the plaintiffs seek to appeal. Because the plaintiffs seek rescission of the current Fairfield Works Agreement, the district court determined that the conflict between those members of the class who have been recalled to work under that agreement and those that have not made certification inappropriate. Because we do not have jurisdiction over the appeal, we do not reach the plaintiffs' arguments for reversal.
 
 
 176
 The decision of a district court denying class certification "does not of its own force terminate the entire litigation because the plaintiff is free to proceed on his individual claim. Such an order is appealable, therefore, only if it comes within an appropriate exception to the final-judgment rule." Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978). The plaintiffs having shown no applicable exception to the final judgment rule, we dismiss their appeal without expressing any view on the merits. See Gonzalez v. Texas Employment Comm'n, 563 F.2d 776, 777 (5th Cir.1977) (dismissing appeal when "appellant, upon whom the burden to show jurisdiction rests, has not demonstrated the applicability of any of the exceptions to" the rule that denials of class certification are not immediately appealable) (internal citation omitted).
 
 V. CONCLUSION
 
 177
 We REVERSE the district court's grant of summary judgment on the plaintiff's RICO claim against USX and the Union, as well as the court's grant of summary judgment on the plaintiffs' Sec. 301 claim against USX for breach of contract. We also REVERSE the decision of the district court granting the defendants a protective order preventing plaintiffs from taking depositions to inquire into the Parton matter. Finally, we REVERSE the district court's decision that the Garner doctrine prevents the Union from asserting the attorney-client privilege against the plaintiffs. In all other respects, we AFFIRM, with the exception of the district court's denial of class certification as to the plaintiff's equitable and declaratory relief, which we have no jurisdiction to review.
 
 
 
 *
 Honorable Harvey E. Schlesinger, U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 The other members of the Fairfield Six are Ralph Gurley, Carl Statum, Virgil Pearson, and Fred Shepard
 
 
 [2]
 At oral argument, counsel for the Union conceded that the pensions "may well" have been worth hundreds of thousands of dollars. USX's records reveal that the pensions received by the Fairfield Six paid from $888.67 per month to $1,183.25 per month. According to the plaintiffs, the present value of such a pension for Emmett Bruce Thrasher, a Union official who was not included in the Fairfield Six, would have been $88,574.00 in 1987. Whatever their precise value, it is clear that the pensions were worth a substantial amount of money
 
 
 [3]
 USX and the Union argue that the grant of summary judgment can be affirmed on the alternative ground that the plaintiffs failed to produce evidence from which the jury could conclude that they were actually injured (as opposed to evidence from which the jury could conclude that the injury was caused by the pension request). However, because a rational jury could infer that the Agreement was more concessionary than it otherwise would have been, the jury could find injury
 
 
 [4]
 When the plaintiffs first raised this issue in the interlocutory appeal, the Union filed a motion, which was carried with the case, to dismiss the plaintiffs' cross-appeal for want of jurisdiction. The Union's argument was that, because the district court denied the plaintiffs' motion for certification of those parts of the order dealing with rulings adverse to the plaintiffs, they should be considered to be different orders for purposes of the interlocutory appeal. The Union's motion was made moot, however, when the plaintiffs raised the same issues in their appeal from the district court's entry of final judgment on the RICO and Sec. 301 claims. "[W]hen reviewing an appeal from a final judgment, this court can review rulings on previous interlocutory orders." Jones v. Preuit & Mauldin, 808 F.2d 1435, 1438 n. 1 (11th Cir.1987) (citing Aaro, Inc. v. Daewoo Int'l (America) Corp., 755 F.2d 1398, 1400 (11th Cir.1985)). The Union's motion to dismiss the cross-appeal is therefore denied
 
 
 [5]
 The plaintiffs have filed a motion to supplement the record on appeal to provide this Court with a more complete record on which to evaluate the defendants' arguments. Although we have the "inherent equitable power[ ]" to supplement the record on appeal, Jones v. White, 992 F.2d 1548, 1566 (11th Cir.1993), the materials offered are not necessary for us to decide this issue, and we therefore decline to exercise that power. The motion is denied